FIFTH DIVISION
April 30, 2010

No. 1-09-0786 & 1-09-0788 (Cons.)

| | | |
|---|---|---|
| BEATRIZ RIVERA, Individually and as Administratrix of the Estate of German Medina, | ) ) ) | Appeal from the Circuit Court Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | 05 L 6141 |
| ROBERT GARCIA, #20642, MICHAEL BOCARDO, #60115, and MARK BAXTROM, #19892, and CITY OF CHICAGO, a municipal corporation, and UNKNOWN CITY OF CHICAGO POLICE OFFICERS, | ) ) ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| ERIC T. URIBE, a Minor, By His Father and Next Friend, FRANCISCO URIBE, and FRANCISCO URIBE, Individually, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | 05 L 6219 |
| THE CITY OF CHICAGO, a Municipal Corporation, ROBERT GARCIA, MICHAEL BOCARDO, JOSEPH LAMB, ESTHER HENIGAN, G. SCHAB, J. PEREZ and UNKNOWN CITY OF CHICAGO POLICE OFFICERS, | ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) ) ) | Honorable Richard J. Elrod Judge Presiding |

JUSTICE LAVIN delivered the opinion of the court:

Pursuit and apprehension of suspected lawbreakers is part and parcel of a policeman's

daily activities. Over the years, most law enforcement agencies, including the Chicago Police Department (CPD), have studied and codified various aspects of the "do's and don'ts" of police pursuits, with the overarching goal being the protection of police personnel, those being pursued and any other citizens who may come within range of potential serious harm, the theory being that it is often the wiser course of conduct to let a wrongdoer escape rather than allow a pursuit to escalate to an unnecessarily dangerous level.

This appeal involves an analysis of the unfortunate, yet foreseeable, consequences of a police pursuit initiated by an off-duty detective who decided to investigate the robbery of personal property from his son. This quickly morphed into a high-speed chase and shootout in a residential neighborhood that injured one and killed another occupant of the vehicle that they were pursuing. Following a two-week trial against various officers and the City of Chicago, the jury returned a verdict in favor of both plaintiffs that were promptly taken away by the trial judge, who determined as a matter of law that the proofs were fatally deficient on the issue of proximate cause.

On appeal, plaintiffs contend that: (1) the trial court erroneously ruled that the conduct by Detective Roberto Garcia could not constitute a proximate cause of the shooting injuries; and (2) the trial court erred by ruling that defendants' conduct in approaching plaintiffs' vehicle could not be a proximate cause of the injuries suffered by the victims. For reasons elucidated at some length below, we reverse the decision of the trial court and reinstate the verdicts returned by the jury and remand the case to the circuit court with instructions to enter judgment in a manner consistent with those verdicts.

1-09-0786 & 1-09-0788 (Cons.)

BACKGROUND

This consolidated case was filed by the father of Eric Uribe, a teenager who was shot and claimed other injuries after the police pursuit, and by the mother of German Medina, a 15 year-old boy who was shot and killed by police at the conclusion of the pursuit.[1] The following facts were adduced at trial.[2]

On February 11, 2005, Eric Uribe was a freshman at Hubbard High School. Early in the evening, he went from a park fieldhouse where he had played basketball to a neighborhood party in Chicago's West Lawn neighborhood. Uribe testified that a young man named Robbie Garcia followed him from the park to the party Also at the party were two teenagers named Julio Colon and German Medina. Uribe got a ride from German Medina upon leaving the party. Medina was unlicensed and driving a stolen white sport utility vehicle (SUV). Uribe testified that the two of them drove around the neighborhood unsuccessfully looking for a friend but eventually German picked up Julio Colon, a person allegedly unknown to Uribe. Then they planned to drop Uribe off at his home.

Robbie Garcia had earlier reported to police that he had been robbed that afternoon of a

---

[1] During the pendency of this litigation Uribe reached his majority and was substituted as the party plaintiff in his lawsuit.

[2] In their brief, defendants mostly used deposition testimony from a summary judgment for its facts. Some of the more inflammatory facts so utilized were either properly barred by the trial court in a motion *in limine* or simply not heard by the jury. This opinion will refer only to those facts heard by the jury at trial.

3

gold chain and a cell phone by three unknown Hispanic males near a pizza place on the southwest side of the city. He called his father, Chicago police detective Roberto Garcia, and told him of the incident as his father was coming home from a tax preparer. Detective Roberto Garcia went home and spoke with his son, who was in the eighth grade at that time. Robbie explained the facts to his father and told him what had been communicated to the beat officer. He did not tell his father that he saw a gun, but his father was allowed to testify at trial that Robbie "thought" one of them had a gun.

This information was tearfully delivered from son to father and Detective Garcia then decided to enlist the assistance of a fellow detective, Michael Bocardo, who was said to be experienced in these types of investigations. Unable to reach the beat officer, who was apparently on a lunch break, or the supervising sergeant in the applicable police district, Detective Garcia decided to investigate the matter on his own, with help from Bocardo and Garcia's brother Alfredo, a Cook County sheriff's police officer who was coincidentally nearby.

Bocardo called his supervisor and told him that he was investigating the incident. Bocardo was driving a so-called covert vehicle, which was unmarked and did not have any oscillating lights, radio or other emergency equipment. Bocardo drove, with Detective Garcia in the front passenger seat and his brother Alfredo in the backseat. After conducting a brief investigation near a strip mall where the robbery had occurred, the three plainclothes officers were driving around the area when Robbie Garcia called his father to inform him that somebody had told him that the perpetrators of the robbery were in a white SUV and that one of them was named German. Soon thereafter, they saw the SUV, made an abrupt U-turn and began pursuit.

Contemporaneously, Bocardo informed his supervisor that they were attempting to surveil the car because they knew that the covert vehicle was not appropriate for making a stop. They hoped to engage a marked car for that purpose. Both Bocardo and Garcia testified that the covert vehicle was not supposed to be used in a pursuit and admitted that their use of the vehicle was contrary to established CPD procedures. In any event, Detective Garcia testified that they pulled up alongside the white SUV, identified themselves as police officers, which prompted the driver of the white SUV to pick up speed and flee. This version of events was contradicted by Uribe, who testified that the men in the red covert vehicle never identified themselves as police and that he and the other occupants of the vehicle he was riding in were frightened by the pursuit. Uribe also testified that their vehicle was rammed from behind and sideswiped several times by the red vehicle during this chase. Physical damage to the vehicle was consistent with this testimony, in that the owner of the stolen vehicle stated that the damage had not been on the vehicle when it was stolen earlier that day.

There was also conflicting evidence at trial about the timing of shots and how many shots were eventually fired, but suffice it to say that there was evidence presented to the effect that Julio Colon and Detective Roberto Garcia were exchanging shots during the early portion of the pursuit. This prompted Bocardo to call in a "10-1" radio report, signifying that the police officers needed assistance. At some point in the chase, one of the bullets (presumably from Garcia's gun, based on a summary of shells found by forensic investigators) struck the rear windshield of a motorist, Mr. Wiggins, who was driving his vehicle on Marquette Avenue shortly before the covert vehicle entered an alley in pursuit of the vehicle being driven by Medina.

5

Other information about the gunfire directed at police in a covert vehicle was also communicated on the radio, presumably so the unmarked car would not draw any friendly fire. The calls prompted four separate police vehicles in the general area to descend upon the residential area of the chase. Colon, the shooter in the white SUV, apparently threw his gun out the car window at some point, with Garcia still firing from the covert vehicle for several blocks and the lead vehicle dodging through several residential streets, an arterial street (Pulaski Avenue) and at least two alleys. When the vehicle neared the intersection of Marquette and Lawndale, it was confronted with police cars in front and behind, and the pursuit was at its motoring end.

After the vehicle came to a stop, according to Uribe, he, Medina and Colon raised their hands, but soon he heard gunfire and ducked down into his seat. Testimony from the police officers and detectives painted a different picture, with Detective Bocardo testifying that he approached the vehicle and saw a black shiny object in Medina's hands, which he believed to be a gun. He then emptied his gun, firing five bullets and killing Medina. At the same time, bullets were being fired at the vehicle from the other side from another responding officer, which could theoretically have killed Bocardo, but he managed to avoid all the bullets. Another officer testified that Uribe had something shiny in his hands and was firing from the car, but it was ultimately determined that nobody in the plaintiffs' vehicle was armed when the chase came to an end. Uribe had also been wounded by gunfire and Colon was not shot. Colon's gun was found blocks away and police said Medina actually had a tire iron in his lap. Photographs from the scene show Medina seated behind the steering wheel with at least two gunshot wounds. The

tire iron had reportedly been removed from his lap by Detective Bocardo before the photograph was taken. Brass knuckles were also found at the scene, but Uribe denied that he had them in his possession or that he had seen a tire iron at any time. Uribe also claimed that the arresting officers kicked and punched him at the scene. Colon was subsequently indicted for his role in the shooting and he declined to testify pursuant to the fifth amendment to the United States Constitution.

## THE TRIAL

After lengthy discovery and numerous amendments to the pertinent pleadings, the case proceeded to trial, with plaintiffs contending that the involved officers wilfully and wantonly engaged in the pursuit with a covert vehicle, leading to the shooting death of Medina and the shooting injury and alleged battery of Uribe.[3] One of the significant pretrial motions concerned the city's claim that the activities of the policemen could not, as a matter of law, be proved to be the proximate cause of the injury to Uribe or the death of Medina. This motion was properly denied by the trial judge a couple weeks before trial began on November 12, 2008.

Plaintiffs examined numerous police officers and detectives about their individual roles in the pursuit and shooting that ensued. Plaintiffs also introduced various CPD procedures on

---

[3] The claims at trial were based on actions stemming from the execution or enforcement of the law. Public employees are generally immune from liability for negligent acts or omissions by the Local Governmental and Governmental Employees Tort Immunity Act, however, this immunity does not extend to acts or omissions constituting "willful and wanton conduct." 745 ILCS 10/2-202 (West 2004).

pursuits and offered the testimony of an expert on the subject of police procedures. That expert, Dennis Waller, testified that Garcia and Bocardo were wilful and wanton in the manner and method that they engaged in the high-speed pursuit in a covert vehicle while exchanging gunfire on neighborhood streets and alleys. He opined that Garcia's shooting at the vehicle during the pursuit was reckless, dangerous and nonconforming with applicable police practices and that the overall management of the pursuit exhibited a conscious disregard for the safety of others, the latter testimony containing the so-called magic words for the wilful and wanton misconduct instruction that was later given to the jury. Waller also faulted the officers for their failure to stop the pursuit when it became clear that it was escalating in speed and violence. In Waller's opinion, their reckless conduct contributed to cause the ultimate outcome of the use of deadly force by Garcia and Bacardo and that of the officers who responded to the "officer needs assistance" call over the radio and the "shots fired" messages. Waller also was critical of the manner in which officers rushed the SUV after the chase had concluded without ascertaining if the occupants were still armed, saying that it was inconsistent with CPD procedure for "high risk vehicle stops" and, in his opinion, wilful and wanton. Finally, Waller was of the opinion that the use of deadly force would not have been necessary had the responding officers all followed proper police procedures.

THE JURY INSTRUCTION CONFERENCE

At the conclusion of the evidence, the court conducted a lengthy instruction conference. During its ruminations on the issues instruction submitted by plaintiffs, the court informed the parties that it had made a substantial shift on the proximate cause issue that had previously been

dealt with in the motion for summary judgment. After having heard the evidence produced at trial, the court announced that it had decided, *sua sponte*, that plaintiffs would be unable to legally establish proximate cause under the facts of this case. This ruling, of course, was contrary to its previous order on defendants' motion for summary judgment on the same issue.

The court indicated that the plaintiffs would only be able to establish causation as it related to any claim of battery, but that causation would fail as a matter of law on any claim that related to the shootings that occurred after the conclusion of the multiple police car pursuit. This led the court to reject the tendered issues instruction by plaintiffs and the issues instructions submitted by the defendants, leaving the court to draft its own instruction which would purportedly cover the court's reconsidered ruling on proximate cause. Despite this voiced ruling, the court's instructions, as drafted, clearly permitted the jury to return verdicts for the shooting injury and death if it found wilful and wanton conduct by Detective Garcia that proximately caused the injury and/or death. The court, over defendants' objection, instructed the jury with the "long form" proximate cause instruction: "When I use the expression 'proximate cause,' I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." Illinois Pattern Jury Instructions, Civil, No. 15.01 (3d ed. 2005). The court also approved six special interrogatories submitted by defendants which were designed to test the jury's findings on Detective Garcia's use of deadly force, wilful and wanton conduct as it related to each of the individual police officers and proof of proximate cause.

9

## THE VERDICTS AND THEIR SEQUELAE

The jury returned a verdict in favor of both plaintiffs and against Detective Garcia and the city, with Medina's estate receiving $1 million for loss of society (and $0 for apprehension of a battery) and Uribe receiving a total of $400,000, of which $25,000 compensated him for apprehension of battery. The jury's answers to the special interrogatories were consistent with the verdicts received by the plaintiffs, since it found that Detective Garcia did not "reasonably believe that [deadly] force was necessary to prevent death or great bodily harm to himself or another" when he fired his weapon, that he was "wilful and wanton" in doing so and that his actions "proximately caused" the "injuries" to Medina and Uribe. The jury gave contrary answers for the other officers, indicating that none of them engaged in "wilful and wanton conduct." These answers were entirely consistent with the jury finding those defendants not liable.

Shortly after the jury returned its verdicts, the court was confronted with choosing a vehicle to deal with its ruling on the causation issue. It decided to set aside the jury's verdicts for the injury and death caused by the shootings and instead entered a verdict of $25,000 for Uribe on the battery claim and entered a verdict of $0 for the Medina estate for the same element of damage since the jury had not awarded damages for that claim. The court reasoned that its action was mandated by its belief that plaintiffs did not and could not prove proximate cause for the shooting injuries and death, as a matter of law. The court also theorized that the jury's answers to the two special interrogatories were consistent with its ruling on proximate causation, offering further justification for setting aside the jury's verdicts. The trial court then denied plaintiffs'

1-09-0786 & 1-09-0788 (Cons.)

posttrial motions and this timely appeal followed.

ANALYSIS

Plaintiffs' principal argument on appeal is that the trial court erroneously ruled that the conduct by Garcia could not constitute a proximate cause of the death of Medina and the shooting injuries suffered by Uribe. Plaintiffs contend that the trial court's action of refusing to enter judgment on the jury verdicts and instead entering judgment only on the jury's battery verdicts was improper because proximate cause had been more than adequately established in their proofs and proximate causation is an issue that is by the jury, except in unusual circumstances not present in the case *sub judice*. We agree.

Although the parties appear to disagree as to whether we are reviewing the trial court's granting of a directed verdict or a finding of inconsistency between the special interrogatories and the jury's verdict, both parties nevertheless agree that the standard of review is *de novo*. See Ahmed v. Pickwick Place Owners Ass'n, 385 Ill. App. 3d 874, 885 (2008) (trial court's finding of inconsistency between a special finding and the general verdict is reviewed *de novo*); Sullivan v. Edward Hospital, 209 Ill. 2d 100, 112 (2004) (directed verdicts are reviewed *de novo*).

It has long been the law in Illinois and elsewhere that proximate cause is preeminently an issue of fact to be decided by the jury. Harrison v. Hardin County Community Unit School District No. 1, 197 Ill. 2d 466, 476 (2001). Although a court can rule as a matter of law that proof of proximate cause is inadequate, our supreme court has held that to do so requires that "the facts are undisputed and reasonable men could not differ as to the inferences to be drawn from those facts." Harrison, 197 Ill. 2d at 476. This court has further held that the lack of

11

proximate cause may only be determined by the court as a matter of law where there is no genuine issue of material fact or only one conclusion is clearly evident. <u>Mulligan v. QVC, Inc.</u>, 382 Ill. App. 3d 620, 630 (2008).

Proof of proximate causation is required in civil cases as a part of the function of the court's responsibility to "determine the appropriate scope of a negligent defendant's liability." D. Dobbs, Torts §180, at 443 (2001). Proximate cause rules:

"give us the language of argument and direct the thought that is brought to bear when the connection between the defendant's negligence and the plaintiff's injury seems tenuous. The rules call for judgments, not juggernauts of logic. In consequence, no version of the rules can be expected to assure any given answer in a particular case, and proximate cause issues must always be determined by the jury on the particular facts of the case." D. Dobbs, Torts §181, at 447 (2001).

There are two aspects to the analysis of proximate cause. <u>Young v. Bryco Arms</u>, 213 Ill. 2d 433, 446 (2004). The first relates to cause-in-fact. In this analysis, one looks for the establishment of sufficient facts that give a reasonable certainty that a wrongdoer's conduct caused the damages involved. <u>Lee v. Chicago Transit Authority</u>, 152 Ill. 2d 432, 455 (1992). The second prong of the proximate cause examination explores legal cause, namely, whether the ultimate injury was reasonably foreseeable. <u>Harrison</u>, 197 Ill. 2d at 476-77. This is satisfied by proof that a reasonable person could foresee that his conduct could lead to the injury complained of. <u>Harrison</u>, 197 Ill. 2d at 476-77. Additionally, where injury is caused by the concurrent negligence of two persons and the accident would not have occurred without the negligence of

12

both, the negligence of each is a proximate cause of the injury. <u>Obert v. Saville</u>, 253 Ill. App. 3d 677, 683 (1993). It follows, therefore, that there may be more than one legal proximate cause of a plaintiff's injuries. <u>Obert</u>, 253 Ill. App. 3d at 683.

Taking the second prong first, it is clear that Detective Garcia and Bocardo could have recognized that their pursuit of the alleged offenders, coupled with a high-speed chase throughout a residential neighborhood, accompanied by frequent gunfire and escalated by alerts to other units to join the pursuit, could ultimately lead to the injury and/or death of those being chased. The very existence of the CPD's policies on pursuit is inexorably linked to the foreseeable injuries and/or death of parties to a dangerous pursuit or to a similar fate that could be met by a bystander, as nearly happened in this case. Several police witnesses testified to the inherent dangers in a covert, or unmarked, vehicle precipitating a high-speed pursuit of a vehicle under these sort of circumstances. Police pursuits are surely not subject to a cookbook breakdown of outcomes, but reckless abandonment of studied and published pursuit policies can hardly be claimed to be incapable of being linked to injuries and/or death at the conclusion of the chase.

Plaintiffs' proof in this regard was rather plentiful. Not only did the jury hear the involved policies of the CPD and the testimony of several involved officers, it heard extensive testimony from an expert on police pursuit procedures. There is quite a body of work on this subject, another indication that it is eminently foreseeable that recklessly joined pursuits can lead to disastrous consequences for involved participants and uninvolved bystanders.

As for cause-in-fact, the evidence in this matter is clearly supportive of the jury's verdicts in this matter. From the beginning, this pursuit was an endeavor that bore visible signs of

13

recklessness. First of all, the entire enterprise came from the impassioned imagination of a father who had assigned himself to the job of finding the perpetrators who had stolen his son's gold chain and cell phone. Detective Garcia noted in his testimony that his young son was crying when he told his father of the robbery. The protective nature of a father is of little benefit to public safety when it is utilized to investigate, pursue and shoot at young men who had stolen personal property from his son. The evidence from the dispatcher indicated not only that Detective Garcia actively recruited others to assist in the pursuit, but also arguably proved that inaccurate information about the number of rounds fired from the vehicle being pursued was given to those listening on the radio, suggesting that they were still under fire after those being chased had already tossed their gun. It goes beyond saying that police officers who are responding to a call for assistance that reports continuing gunfire will approach the scene in a manner that suggests that their lives may well be at risk, resulting in a situation that can become quite explosive.

We therefore reject the City of Chicago's suggestion that it would be unforeseeable that the alleged criminals who were being pursued would be at an increased risk of serious injury or death under these circumstances. Police procedure expert Waller commented on and quoted at trial portions of a CPD general order which provides that "[m]otor vehicle pursuits are a serious matter with a potential for death and/or injury to the officers, persons in the vehicle being pursued, and/or innocent persons in the area."[4] Those very risks arising from motor vehicle

---

[4] We acknowledge that "countermanding a police department general order does not constitute negligence or willful and wanton conduct *per se*." Hudson v. City of Chicago, 378 Ill.

pursuits are recognized by the CPD in its "high risk vehicle stop" procedure (also discussed by police procedure expert Waller at trial), which explains certain tactics to "control and slow down" vehicle stops where "the officers involved possess information leading them to reasonably suspect that the occupants of the vehicle may pose a safety threat" because such stops are inherently "chaotic, highly charged situation[s]." The trial court acknowledged the increased risk of serious injury or death under those circumstances when it commented on the "mindset" of the subsequent responding officers being productive of having a reasonable fear of one's life given what they had heard on the radio. This was further confirmed through the testimony by the various officers who approached plaintiffs' vehicle after the pursuit. For example, Officer Baxtrom assumed that the Colon was "still shooting at the police" when he approached the vehicle and Officer Lamb expected "gunplay," but the uncontradicted evidence was that the teenagers were unarmed toward the end of the pursuit, with the gun having been thrown from the car blocks before the deadly end of the chase. Bluntly put, it seems clear that but for the recklessly joined pursuit by the victim's off-duty detective father and his colleague Detective Bocardo, the injury and death here would not have occurred. That, to us, means proximate cause was established and it was clear error for the trial judge to take away the verdicts of the jury.

Plaintiff's citation of Ney v. Yellow Cab Co., 2 Ill. 2d 74 (1954), is not surprising given the fact that it is the seminal Illinois Supreme Court case on causation and the case which surely

---

App. 3d 373, 405 (2007), citing Morton v. City of Chicago, 286 Ill. App. 3d 444, 454 (1997). This court has nevertheless also recognized that "violation of an internal police department rule can constitute some evidence of willful and wanton conduct." Hudson, 378 Ill. App. 3d at 405.

15

is the central basis for the proximate cause instruction given to this jury. The factual circumstances in the <u>Ney</u> case must sound puerile when compared to the combustible fact pattern in the case *sub judice*, but they bear repeating. In <u>Ney</u>, a cab driver left keys in a cab, which created an environment where a thief could steal the cab and later cause a vehicular accident. In language that has been quoted countless times in the 56 years since it was decided, our supreme court held:

> " 'The injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which resulted from his act.' ***
> '*** The intervention of independent, concurrent or intervening forces will not break causal connection if the intervention of such forces was, itself, probable or foreseeable.' "
> <u>Ney</u>, 2 Ill. 2d at 79, quoting <u>Neering v. Illinois Central R.R. Co.</u>, 383 Ill. 366, 380 (1943), and <u>Johnston v. City of East Moline</u>, 405 Ill. 460, 464 (1950).

The lessons of <u>Ney</u> are still applicable today to the facts of this case. It was not necessary for plaintiffs here to establish with precision the foreseeability of the death of Germain Medina and the injury to Eric Uribe at the denouement of this dangerous pursuit; they only needed to persuade the jury that the death and injury were the natural or probable result of conduct which the jury later specifically found to be wilful and wanton.

Plaintiffs also cite two police pursuit cases which stand for the same causation principle as that enunciated in <u>Ney</u>. In <u>Suwanski v. Village of Lombard</u>, 342 Ill. App. 3d 248 (2003), a

suburban police officer was involved in a high-speed chase through several different suburbs which resulted in the fleeing vehicle colliding with the plaintiff's vehicle. Evidence in the case included the relevant police pursuit policy which was ignored by the officer and testimony that another police officer from another municipality wisely terminated her pursuit. Plaintiff also introduced evidence from an expert to the effect that termination by the defendant officer would have avoided the fatal collision. This court held that a pursuit of an eluding vehicle through various residential and commercial streets could result in injury to some third person, a consequence which the pursuing officer could have been found to reasonably anticipate. Suwanski, 342 Ill. App. 2d at 256. In Sundin v. Hughes, 107 Ill. App. 2d 195 (1969), the plaintiff was a pedestrian that was struck by the body of another pedestrian, who had been struck by a fleeing driver during a police pursuit. The Sundin court determined that a negligence action against the defendant police officer, who had initiated the pursuit, could be maintained. It was held that the behavior of a fleeing driver during a pursuit by the defendant officer, who failed to sound or display any warning during the pursuit, was foreseeable and therefore not a superceding cause. Sundin, 107 Ill. App. 2d at 203. The Sundin court also held that it was not essential that the defendant could have foreseen the precise injury which ultimately occurred.

In the previously referenced treatise on torts, Professor Dan Dobbs specifically addressed the application of proximate causation in the context of a police pursuit case:

> "Contemporary cases involving high speed police chases also illustrate the principle that when the intervening acts are themselves within the risk created by the defendant, they are not superseding causes. Police in pursuit of a law violator may enjoy

an immunity from liability or they may not be negligent at all. But if they have no immunity and they are in fact negligent, the risk they create is that some person will be harmed by the negligent high-speed driving of the police or their quarry. If the quarry collides with bystanders, the quarry's negligence cannot logically count as a superseding cause, since, by hypothesis, the police, if negligent at all, must have been negligent because they could foresee that the high speed chase might injure someone. The quarry's negligence was not only foreseeable, but was the very risk that made the officers negligent. Most courts therefore hold that when injury occurs before the chase is called off, it is for the jury to determine whether the quarry's negligence is a superseding cause." D. Dobbs, Torts §192, at 479-80 (2001).

This analysis, while focused on injuries caused mainly by the dangerous driving of those being chased, is clearly germane under the facts in this case. It was not only foreseeable that those being chased by Bocardo and Garcia (and the others called to the pursuit) could injure somebody in attempting to elude the police while driving recklessly through a residential neighborhood, it was also quite foreseeable that somebody could get shot if the pursuit were not halted at an appropriate time. This pursuit was initiated by an off-duty detective, who was the father of a crime victim. It acquired the volatile accelerant of gunshots being fired from the principal vehicles in the chase. An innocent bystander's vehicle was shot during the chase, but rather than suspend the inappropriately initiated pursuit, the precipitating actors enlisted the assistance of their professional colleagues who would, quite naturally, be at a heightened state of anxiety and in a reasonable fear for their lives. We are therefore not persuaded by the city's

argument that the actions of the later officers, while understandable and arguably lawful given the circumstances, could not be legally connected to those who started the entire enterprise.

We make this ruling cognizant of the fact that some might observe that Uribe and Medina were not entirely innocent actors in this situation.[5] Medina was driving a stolen vehicle and did not have a driver's license. A tire iron was found in his lap when he was shot. Uribe was said to have brass knuckles in his possession at the time of his arrest. And, most significantly, an occupant of their vehicle was firing a gun at the unmarked police vehicle pursuing them. Focusing only on these facts to the exclusion of the conduct of the professional police officers is merely a red herring, because none of the "wrongdoing" from the pursued vehicle's occupants would have led to injury or death without the extremely ill-advised decision by the off-duty detective to engage in a high-speed pursuit and the equally reckless decision as police professionals to continue that pursuit in a covert vehicle after shots had been fired, when they were investigating a robbery of personal property of a relative. Had the pursuit never been initiated or had it been abandoned at an appropriate time, the ultimate injury and loss of life would not have occurred. This was surely the view of the jury that heard the hotly contested evidence of this lengthy trial and we believe that the trial judge should not have disturbed its verdicts.

---

[5] The city raised an affirmative defense of contributory negligence on the part of the decedent and the plaintiff Uribe, but chose to not offer any jury instructions on the subject, so any conduct on their part could not have operated to reduce any recovery by Uribe individually or by the estate of Medina.

We also find that the facts of this case are dissimilar from those cases in which a lawbreaker is injured when crashing his vehicle at a high rate of speed while attempting to elude police. See, *e.g.*, Kimber v. City of Warrenville, 248 Ill. App. 3d 361 (1993). In the case at bar, the young men who were injured and killed after the police chase had concluded were initially chased by the unmarked vehicle as suspects of a nonviolent property crime and they met their fate after their backseat companion had already ditched the gun that he had ill-advisedly shot at their pursuers. Hypothetically speaking, had they met their fate as a result of their stolen vehicle hitting a tree, the result in this analysis could surely be different.

Based upon the overwhelming evidence that provided a clear nexus between the wilful and wanton conduct of the officers in initiating this pursuit to the shooting injury of Uribe and the shooting death of Medina, we hold that the trial court erroneously vacated the jury's verdicts and improperly entered judgment for a lesser amount in Uribe's claim and for $0 damages in Medina's death case. Under the specific circumstances here, where the jury not only found for plaintiff on liability and found damages but also answered the special interrogatories in a fashion that was consistent with the plaintiffs prevailing, we hereby remand this case to the trial court with directions to vacate the judgments entered by the court and to reinstate the jury verdicts properly returned in this matter and enter judgment, *nunc pro tunc*, November 26, 2008, in the amounts returned by the jury.

Because we reverse on this issue, we decline to address plaintiff's remaining contention that the trial court erred by ruling, as a matter of law, that defendants' conduct in approaching the white SUV could not be a proximate cause of Medina's death and Uribe's injuries.

20

1-09-0786 & 1-09-0788 (Cons.)

For the foregoing reasons, we reverse the judgment of the circuit court of Cook County.

Reversed and remanded with instructions.

TOOMIN, P.J., and HOWSE, J., concur.

REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each Case)

| Please Use Following Form: | |
|---|---|
| Complete TITLE of Case | BEATRIZ RIVERA, Individually and as Administratrix of the Estate of Ferman Medina,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>ROBERT GARCIA #20642, MICHAEL BOCARDO, #60115, and MARK BAXTROM, #19892, and CITY OF CHICAGO, a municipal corporation, and UNKNOWN CITY OF CHICAGO POLICE OFFICERS,<br>Defendants-Appellees.<br><br>ERIC T. URIBE, a minor, by his father and next friend, FRANCISCO URIBE, and FRANCISCO URIBE, individually,<br>Plaintiffs-Appellants,<br><br>v.<br><br>CITY OF CHICAGO, a municipal corporation, ROBERT GARCIA, MICHAEL BOCARDO, JOSEPH LAMB, ESTHER HENIGAN, G. SCHAB, J. PEREZ and UNKNOWN CITY OF CHICAGO POLICE OFFICERS,<br>Defendants-Appellees. |
| Docket No.<br><br>COURT<br><br><br>Opinion Filed | Nos. 1-09-0786 & 1-09-0788<br>Appellate Court of Illinois<br>First District, FIFTH Division<br><br>April, 30, 2010<br>(Give month, day and year) |
| JUSTICES | JUSTICE LAVIN delivered the opinion of the court:<br><br>Toomin, P.J., and Howse, J.,                    concur [s]<br><br>_____ dissent[s] |
| APPEAL from the Circuit Ct. of Cook County, Law Div. | Lower Court and Trial Judge(s) in form indicated in the margin:<br><br>The Honorable    Richard J. Elrod, Judge Presiding.<br><br>Indicate if attorney represents APPELLANTS or APPELLEES and include |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | attorneys of counsel.  Indicate the word NONE if not represented.<br><br>**Attorney for Plaintiffs-Appellants/Cross-Appellees:**<br>Rivera                    Law Offices of Robert B. Patterson, Ltd.<br>                    205 W. Wacker Drive<br>                    Suite 900<br>                    Chicago, IL  60606<br>                    Phone 312.236.0995<br>Attorneys for **Defendants-Appellees/Cross-Appellants:**<br>Garcia, Uribe            Mara S. Georges, Corporation Counsel of the City of Chicago,<br>                    Benna Ruth Solomon, Deputy Corporation Counsel, Myriam Zreczny Kasper, Chief Assistant Corporation Counsel<br>                    30 N. LaSalle St., Suite 800<br>                    Chicago, IL 60602<br>                    312.744.7764<br>          Of counsel:    Ruth F. Masters<br>                    MastersLaw<br>                    7115 W. North Avenue, #296<br>                    Oak Park, Illinois 60302<br>                    708.445.8031 |