2019 IL App (3d) 170698

Opinion filed April 19, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| BRIAN DAYTON, Individually and as the Special Administrator of the Estate of Jill D. Dayton, Deceased, and AMANDA DAYTON NEHRING, | ) ) ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, McDonough County, Illinois. |
| Plaintiffs-Appellants, | ) ) | Appeal No. 3-17-0698 Circuit No. 06-L-9 |
| v. | ) ) | |
| THOMAS PLEDGE and THE MCDONOUGH COUNTY SHERIFF'S DEPARTMENT, | ) ) ) | Honorable Richard H. Gambrell, |
| Defendants-Appellees, | ) | Judge, Presiding. |

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices Carter and Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiffs Brian Dayton, individually and as special administrator of the estate of Jill D.

Dayton, and Amanda Dayton Nehring filed a wrongful death and negligence complaint against

Deputy Thomas Pledge and the McDonough County Sheriff's Department seeking damages

related to a high-speed pursuit, which resulted in the death of Jill and bodily injury to Amanda

when Pledge's squad car struck the Dayton minivan. The jury returned verdicts in favor of

plaintiffs, and defendants moved for judgment *n.o.v.* and a new trial. The trial court granted

defendants' motion and vacated the jury's verdicts. On appeal, plaintiffs argue that (1) judgment *n.o.v.* was inappropriate where reasonable minds might differ as to whether Pledge's pursuit of the fleeing vehicle was willful and wanton, (2) the trial court erred in granting defendant's motion for new trial because the verdicts were not against the manifest weight of the evidence, and (3) the verdicts on separate claims were not legally inconsistent. We reverse the judgment of the trial court and remand with directions.

¶ 2                                BACKGROUND

¶ 3        Around 11:30 p.m. on September 3, 2004, Pledge responded to a call regarding an erratic driver operating a white sports utility vehicle (SUV). Pledge located the SUV headed south on Route 67 in a rural area of McDonough County. He followed the vehicle for a few miles on the four-lane divided highway. After observing the vehicle swerve several times, Pledge stopped the vehicle. As Pledge approached the passenger side, the SUV sped away. Pledge ran back to his squad car and pursued the vehicle. The SUV proceeded southbound on Route 67 with its lights off. Pledge followed, reaching speeds as high as 110 miles per hour. The SUV and Pledge headed into Macomb. As they approached the intersection of Route 67 and University Avenue, near Western Illinois University, Pledge announced to dispatch that he was traveling "100" miles per hour.

¶ 4        At the same time, a minivan, driven by Amanda Dayton, was traveling north on Route 67. Amanda's mother, Jill, was navigating in the passenger seat. Amanda entered the left turn lane at the intersection of University Avenue and Route 67. As she did so, the SUV Pledge was pursuing passed through the intersection, directly in front of the minivan. As Amanda continued her left turn, Pledge's squad car entered the intersection and struck the passenger side of the minivan, killing Jill and severely injuring Amanda.

¶ 5        Amanda and her father, Brian, filed suit against Pledge and the McDonough County Sheriff's Department to recover damages for their injuries. The complaint asserted wrongful death and bodily injury, alleging that Pledge acted negligently and willfully and wantonly in pursuing the SUV and that the sheriff's department was liable under the *respondeat superior* doctrine. Defendants filed a motion for summary judgment, arguing that plaintiffs' claims were barred by the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-202 (West 2004)) because Pledge's pursuit of the fleeing vehicle could not be classified as willful and wanton conduct. The trial court denied defendants' motion, and the case proceeded to trial.

¶ 6        At trial, Amanda and Brian testified on behalf of plaintiffs, and depositions of occurrence witness Lindsey Clingan and a medical doctor were read into evidence. Reconstruction specialist Michael O'Hern and Pledge testified for the defense. The defense also tendered a line-of-sight video created by O'Hern that depicted the position of the vehicles as Pledge approached the intersection from Amanda's point of view. Following closing arguments, the jury returned a verdict for defendants, and the Daytons appealed.

¶ 7        On appeal, the Daytons argued that the trial court erred in, among other things, admitting the defense's line-of-sight video and instructing the jury on the limited use of that video. This court found that the Daytons were entitled to a new trial because the trial court abused its discretion in admitting the video and that the improper admission resulted in prejudice. See *Lorenz v. Pledge*, 2014 IL App (3d) 130137. We reversed and remanded for a new trial. *Id.* ¶ 32.

¶ 8        At the second trial, Pledge testified that on September 3, 2004, he received information about an SUV headed south on Route 67 being driven by someone that was possibly driving under the influence. He waited along Route 67, north of Macomb, and when the SUV passed, he

3

pulled out and followed it. He activated his dash camera and followed the SUV for approximately three miles. After observing the vehicle swerve several times, Pledge initiated a traffic stop, and the SUV pulled over. He confirmed the license plate number and exited the squad car. As he approached the passenger side of the SUV, the vehicle sped away. Pledge ran back to his car and pursued the vehicle.

¶ 9        The dash camera video, which was admitted into evidence, shows Pledge running back to the car and announcing "pursuit into Macomb." As the SUV speeds away, the driver turns off the lights. The pursuit continues south on Route 67 into Macomb with both vehicles traveling at speeds in excess of 100 miles per hour. Roughly a mile north of the intersection Pledge reports his speed as "110 miles per hour."

¶ 10        Pledge testified that he followed the SUV toward the intersection of Route 67 and University Avenue with his lights and siren activated. His lights and siren remained on for the duration of the pursuit to advise the public of emergency and advise law enforcement of his location. He knew University Avenue was the entrance to Western Illinois University and that there was increased traffic in the area due to the holiday weekend. He was also aware of prior accidents at that intersection. He testified that, as a driver of an emergency vehicle, he was permitted to exceed the maximum speed limit so long as he did not endanger life or property. He also knew that high-speed pursuits were dangerous to other motorists and "certainly could" put innocent people in harm's way. He noted that the blacked-out vehicle was a "huge safety concern" and he was "pretty convinced" that it was going to crash.

¶ 11        Pledge maintained radio contact with the dispatcher during the entire pursuit. At some point, he heard the Macomb Police Department "talking about putting out spike strips" to assist

4

in apprehending the driver of the SUV. It was his understanding that they were taking steps to apprehend the vehicle about one-half mile south of the University Avenue intersection.

¶ 12    As Pledge approaches the city limits of Macomb on the dash camera video, he announces a speed of "100" miles per hour and drives past a Clark gas station approximately 1700 feet north of University Avenue. He testified that as he passed the station he saw the Dayton minivan in the northbound left turn lane with its left turn signal activated. He assumed the vehicle was going to make a left turn and was aware of prior collisions from vehicles turning at that intersection. Pledge stated that he was going 70 to 75 miles per hour as he passed the gas station. The posted speed limit 450 feet north of the intersection was 40 miles per hour.

¶ 13    Approximately 185 feet before the intersection, a white line divides Route 67 and the right turn lane. Pledge testified that at the beginning of that dividing line he applied "maximum" braking. After the blacked-out SUV passed through the intersection, Pledge collided with the Dayton minivan as it was making a left-hand turn. Pledge recalled the traffic signal was green for southbound traffic and remained green until the collision. The entire pursuit, from the time Pledge ran back to his vehicle to the time his squad car struck the Dayton minivan, lasted 77 seconds.

¶ 14    Pledge stated that he was aware of the high speed pursuit policy of the McDonough County Sheriff's Department and that compliance with the policy was mandatory. Pledge knew that to pursue a vehicle at high speeds he "must comply first with section 3.02," which required him to determine that there was a serious felony involving an actual or threatened attack.[1] Pledge

---

[1] Section 3.02, paragraph II states:
"A. It is the policy of this Department the [*sic*] 'fresh pursuit' at high speeds is justified only when the officer knows or has reasonable grounds to believe the violator has committed or attempted to commit a serious felony. A serious felony is one that involves an actual or threatened attack which the officer has reasonable cause to believe could or has resulted in death or serious bodily injury, *e.g.*, Aggravated Assault, Armed Robbery,

5

also acknowledged that the pursuit of the SUV for suspected driving under the influence was a misdemeanor. He admitted that he had no information about a serious felony involving an actual or threatened attack at that time. Pledge confirmed that he had the SUV license plate number and knew the identity of the owner when he ran back to his squad car and pursued the vehicle. He also knew that under section 4.03 of the pursuit policy, he had a duty to avoid contributing to the danger already created by the SUV.[2] Pledge intended to apprehend the suspect while exercising maximum safety.

¶ 15    Lindsay Clingan was in her car facing west at the University Avenue intersection that evening. She waited at the stop light and then turned right onto Route 67. As she headed north on Route 67, she looked in her rear view mirror and witnessed Pledge's squad car crash into the side of the Dayton minivan. She testified that before she completed her turn onto Route 67, she saw the minivan moving into the left turn lane at the University Avenue intersection. She also saw Pledge's squad car passing the gas station traveling "about 100 miles per hour." After completing her turn, she saw the SUV pass by the minivan. Clingan then saw Pledge heading into the intersection and said that "he continued between 90 and 100 miles per hour." She did not see Pledge's brake lights illuminate in her rear view mirror but admitted that she was talking on her cell phone as she was turning. According to her testimony, Pledge did not take any action to avoid the minivan.

¶ 16    Amanda testified that she drove to Macomb with her mother and a friend on September 3, 2004, to visit Western Illinois University. Her mother was riding in the front passenger seat.

Burglary, and Arson of an occupied building." McDonough County Sheriff's Department Policy § 3.02, ¶ II(A) (2004).

[2] Section 4.03, paragraph II states:
"D. ***. It is understood that the officer's ability to supervise or control other motorists by the nature of existing circumstances is limited, but it is his duty to avoid contributing to the danger already created by the violating motorists." McDonough County Sheriff's Department Policy § 4.03, ¶ II(D) (2004).

Amanda was headed north on Route 67 when she entered the left turn lane at the University Avenue intersection. The light was green, and she had her left turn signal on. Amanda testified that she did not see any squad car lights or hear sirens, and her mother did not mention any emergency lights. She testified that as she moved through the turn lane, "out of nowhere this SUV came flying around my car at an insane rate of speed, very, very fast. He had…or it had no headlights on. So I didn't see anything until it went by my window and I just looked and saw it and that's the last thing I remember."

¶ 17    Amanda suffered a fractured scapula. She testified that immediately after the accident she experienced nightmares and flashbacks. Since 2006, she has been under the care of psychologists and psychiatrists and has been taking anti-anxiety medication. Her psychiatrist, Dr. Brian McFaul, testified that when Amanda first sought psychiatric care in 2006, she had been in a chronic state of tension since the collision. McFaul explained that Amanda suffered from anxiety and panic attacks and continues to suffer from post-traumatic stress disorder. He prescribed Zoloft, an anti-anxiety medication, to elevate her symptoms. Amanda reduced her medication in January 2010 and was no longer taking Zoloft when he saw her on April 12, 2010. McFaul stated that it was not clear if Amanda discontinued her medication on her own or on the advice of another doctor. She had horrible anxiety again and could not eat. McFaul restarted her medication, and Amanda's condition improved.

¶ 18    Dr. Geoffrey Alpert, a professor of criminology at the University of South Carolina, testified that he has studied police pursuits for over 30 years and has worked for the National Institute of Justice, which helps write pursuit policies for police departments. He opined that, while following the SUV for several miles before initiating the traffic stop, Pledge had ample time to consider the department policies and determine that a high-speed pursuit would be

7

inappropriate. He explained that a well-trained officer understands that fleeing is a possibility and evaluates any department policy that may apply. He believed that Pledge's pursuit violated sections 3.02 and 4.03 of the sheriff's department's pursuit policy. He noted that section 3.02 allowed a high-speed pursuit only when the officer "knows or has reason to believe that the offender committed a serious felony, which is an attack." Alpert testified that based on his evaluation of the policy provisions, Pledge acted recklessly and with a conscious disregard for the safety of others when he engaged in a high-speed pursuit for an offense that was not included in the policy. Once the pursuit began, Pledge was "covering too much ground too quickly to make decisions properly."

¶ 19        Alpert also testified that civilian drivers are unpredictable. He noted that drivers typically do not expect other vehicles to be traveling 100 miles per hour and they cannot react quickly. He believed that pursuing a fleeing vehicle through a congested intersection is "like playing Russian roulette" because the officer cannot predict how other drivers will react. Alpert concluded that Pledge's decision to pursue the SUV "turned into a dangerous high speed pursuit, but [Pledge] consciously disregarded the safety of everyone, including himself." He opined that, had Pledge complied with the department's policy, he would not have crashed into the Dayton minivan.

¶ 20        O'Hern, a reconstruction specialist, analyzed the accident by studying photographs, the police report, the dash camera video and witness recollections. O'Hern used detailed measurements, vehicle location, and speed to explain how Pledge collided with the minivan in the right-hand lane of southbound traffic. According to his analysis, Pledge applied "heavy but not maximum" braking from the dividing line at the intersection of Route 67 and University Avenue to the point of impact. He testified that when Pledge first saw the Dayton minivan in the left turn lane, he was 1700 feet north of the intersection. He used standard calculations for

8

momentum, time, and distance to estimate Pledge's speed during the pursuit. Using the dash camera video, he calculated Pledge's speed at an average of 86 miles per hour for the final 185 feet, 73 miles per hour over the final 65 feet, and 70 miles per hour at impact. He noted that at a speed of 100 miles per hour, Pledge's stopping distance was more than 506 feet. In his opinion, Pledge was "definitely slowing" from 110 miles per hour to 86 miles per hour immediately before the intersection. O'Hern concluded that Amanda's failure to yield to oncoming traffic and to an emergency vehicle caused the crash.

¶ 21 On cross-examination, O'Hern testified that he found no evidence of skid marks from Pledge's squad car at the intersection or approaching the intersection. He opined that the video showed that the lights from the Dayton minivan were visible 13 seconds before impact but admitted that two people could disagree about what the video showed. He also noted that moments before impact the headlights were obstructed by the SUV for a full second. He stated that, when the headlights of the minivan reappeared, Pledge had approximately 2 to 2½ seconds to perceive and react to the Dayton minivan. O'Hern testified that 2½ seconds was not a sufficient amount of time for Pledge to avoid a crash.

¶ 22 O'Hern further noted that, according to state law, a driver turning left must yield the right-of-way to an emergency vehicle upon its immediate approach. He opined that a normally prudent person making a left turn in a 40-mile-per-hour speed zone would be looking 200 to 300 feet down the road for approaching vehicles before making the turn. However, he admitted that if Pledge had been traveling 5 seconds behind the SUV instead of 2 seconds, there was "no question that the collision would not have occurred."

¶ 23 Sergeant William McCamant, an Illinois State Trooper who investigated the accident, reported to the scene that evening and collected evidence. He stated that there was no indication

that the Dayton minivan ever stopped or that Pledge applied his brakes. He found no skid marks from Pledge's vehicle prior to impact and no evidence of any other evasive maneuver. McCamant used the dash camera video timer, measurements and the mathematical formula for speed to form his opinion. He estimated Pledge's speed at impact as 73 miles per hour in a 40-mile-per-hour speed zone.

¶ 24    McCamant testified that on the evening of the accident, Amanda told him that as she came up to the intersection she saw an SUV and looked to the south as it drove past her. She looked back to the north and saw the squad car but could not stop in time to avoid the collision. According to the dash camera video, the crash occurred approximately two seconds after the SUV drove through the intersection. McCamant concluded that Amanda had a duty to yield to oncoming traffic because she was making a left-hand turn on an unprotected green light. He also noted that Amanda had a duty to yield to Pledge's squad car, as an emergency vehicle, with its lights and siren activated.

¶ 25    The jury began deliberations with several verdict forms for both counts. "Verdict Form A" for the wrongful death count stated:

"We, the jury, find for the Estate of Jill Dayton and Brian Dayton, individually, and against Thomas Pledge and the McDonough County Sheriff's Department.

First: We find that the total amount of damages suffered by the Estate of Jill Dayton, deceased is: _____.

* * *

Second: Assuming that 100% represents the total combined negligence of Thomas Pledge and Amanda Dayton-Nehring, we find that the percentage of

10

negligence that was a proximate cause of the death of Jill Dayton attributable solely to Amanda Dayton-Nehring is ___ percent (%)."

"Verdict Form C" for the bodily injury count provided:

"We, the jury, find for Amanda Dayton-Nehring, individually, and against Thomas Pledge and the McDonough County Sheriff's Department and further find the following:

First: Without taking into consideration the question of the reduction of damages due to the negligence of Amanda Dayton-Nehring, individually, we find that the total amount of damages suffered by Amanda Dayton-Nehring as a proximate result of the occurrence in question is _____.

* * *

Second: Assuming that 100% represents the total combined negligence of all persons whose negligence proximately contributed to plaintiff, Amanda Dayton-Nehring's injuries and damages, including Thomas Pledge and Amanda Dayton-Nehring, we find that the percentage of such negligence attributable solely to Amanda Dayton-Nehring is ___ percent (%)."

¶ 26    The jury returned a verdict for the plaintiffs on the wrongful death claim, awarding $3,660,968 in damages and finding that the percentage of negligence on Amanda's part was 0 percent. It also returned a verdict in favor of Amanda on the bodily injury claim, awarding her $468,065 in damages and finding that the percentage of her own negligence attributable to her injuries was 12.5%. The trial court certified the verdict and allocated the damages pursuant to the Wrongful Death Act. See 740 ILCS 180/2(i) (West 2016).

11

¶ 27    Defendants filed a motion for judgment *n.o.v.* and a new trial. The trial court granted defendants' motion for judgment *n.o.v.* The court concluded that judgment *n.o.v.* was appropriate because plaintiffs failed to prove that Pledge's conduct was willful and wanton and failed to demonstrate proximate cause. Specifically, the court held that it was not foreseeable that Amanda would pull into Pledge's lane to complete a left turn after yielding to the SUV. The trial court also granted defendants' motion for a new trial, finding that the verdicts were against the manifest weight of the evidence and legally inconsistent.

¶ 28                                      ANALYSIS

¶ 29                                 I. Judgment *N.O.V.*

¶ 30    The Daytons first argue that the trial court erred in granting defendants' motion for judgment *n.o.v.* They claim that defendants are not entitled to judgment as a matter of law because, when viewed in the light most favorable to plaintiffs, the evidence showed that Pledge's conduct was willful and wanton and that his pursuit of the SUV was the proximate cause of the crash that resulted in Jill's death and Amanda's injury.

¶ 31    A motion for judgment *n.o.v.* should be granted only when all the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the moving party that no other verdict based on the evidence could stand. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 177 (2008) (citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). The *Pedrick* standard is a "very difficult standard to meet, limiting the power of the [trial] court to reverse a jury verdict to extreme situations only." *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714 (1994). The trial court must resolve evidentiary conflicts in favor of the plaintiff, and if it finds any evidence which, if believed, could support a verdict for the plaintiff, it is error to direct a verdict for the defendant. *Hicks v. Hendricks*, 33 Ill. App. 3d

                                           12

486, 490 (1975). The court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences, demonstrating a factual dispute or where the credibility of the witnesses or an assessment of the conflicting evidence is decisive to the outcome of the trial. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). We review *de novo* a trial court's decision to grant or deny a motion for judgment *n.o.v. Harris v. Thompson*, 2012 IL 112525, ¶ 15. That is, the reviewing court applies the same *Pedrick* standard as did the trial court. *Id.*

¶ 32                                        A. Willful and Wanton Conduct

¶ 33        The Tort Immunity Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2014). The Act further defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2014). Whether conduct is willful and wanton is ultimately a question of fact for the jury. *Doe v. Calumet City*, 161 Ill. 2d 374, 390 (1994).

¶ 34        Defendants argue that the trial court did not err in granting judgment notwithstanding the verdict in their favor because there was no evidence to show that Pledge acted with utter indifference to or conscious disregard for the safety of others. They contend that, as matter of law, an officer's violation of internal policy and speeding do not constitute willful and wanton conduct, citing our decision in *Hall v. Village of Bartonville Police Department*, 298 Ill. App. 3d 569 (1998).

¶ 35        In *Hall*, the driver of a vehicle collided with a truck, which was being pursued by police. The driver filed suit against the pursuing officer alleging violations of department procedures,

13

willful and wanton conduct, and reckless disregard for the safety of others. *Id.* at 570-71. In affirming summary judgment in favor of the officer and the department, this court noted that the pursuit was not in a densely populated urban area and the duration of the chase was relatively brief. *Id.* at 573.

¶ 36 However, the facts in this case are more analogous to those in *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248 (2003). In *Suwanski*, the court recognized that determining willful and wanton conduct in the context of police pursuits is difficult and should be made on a case by case basis:

"We begin our analysis by observing that in the context of police pursuits there exists a wide array of factual possibilities which create a range of conduct that will fall somewhere on the spectrum of liability. Some situations will be so benign as to clearly be, as a matter of law, below the theoretical minimum for willful and wanton conduct. Those cases should, of course, be disposed of by summary judgment. There may also be some cases where the circumstances are so egregious that one could say, as a matter of law, that the officer acted willfully and wantonly. The third possibility is those circumstances where the question of willful and wanton conduct is the subject of reasonable argument. It is those cases that cannot be decided as a matter of law and must be put to the jury." *Id.* at 257.

¶ 37 In this case, the question of willful and wanton conduct is open to reasonable argument. Certain facts support a finding that Pledge's conduct was not willful and wanton, including the erratic maneuvers of the SUV and the suspected DUI violation, the rural four-lane highway on which the pursuit began, Pledge's use of his emergency lights and siren, and his attempt to reduce his speed as he entered the intersection. But undisputed facts also support a finding of

14

willful and wanton conduct. The testimony revealed that Pledge had obtained the license plate number of the SUV when he initiated the stop, he knew there had been prior accidents at the intersection of Route 67 and University Avenue, he was traveling 100 to 110 miles per hour as he approached Macomb, and the black-out SUV was also traveling in access of 100 miles per hour. The department's pursuit policy justified high-speed pursuit only if the violator had committed a felony involving an actual or threatened attack, and Pledge testified that the SUV had not committed a felony involving an actual or threatened attack. Thus, the trier of fact could have made the reasonable inference that the identity of the suspect was obtainable from the license plate number without the high speed pursuit and that the officer's decision to pursue the vehicle into Macomb, in violation of department policy, showed an utter indifference for the safety of others.

¶ 38     All the evidence, when viewed in the light most favorable to the Daytons, was sufficient to create an issue of fact as to whether Pledge's conduct was willful and wanton such that Pledge was liable for his actions as an employee of the McDonough County Sheriff's Department. The jury found that Pledge's high speed pursuit demonstrated willful and wanton behavior; we have no basis to disturb that determination.

¶ 39                                B. Proximate Cause

¶ 40     In an action for negligence, including one in which the defendant's alleged conduct is willful and wanton, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached this duty, and that the breach was the proximate cause of the plaintiff's injuries. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257 (2004). A proximate cause analysis involves two aspects: cause-in-fact and legal cause. *Rivera v. Garcia*, 401 Ill. App. 3d 602, 610 (2010). The primary question in a cause-in-fact analysis is whether a defendant's conduct was a

15

material element and a substantial factor in bringing about the injury. *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 476 (2001). Where reasonable minds could differ as to whether a defendant's conduct was a substantial factor in bringing about a plaintiff's injury, the question is one for the jury to decide. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). Legal cause, on the other hand, involves an assessment of foreseeability. *Suwanski*, 342 Ill. App. 3d at 255. "[A] negligent act is a legal proximate cause of an injury if the injury is of the type that a reasonable person would foresee as a likely result of his conduct." *Id.* Proximate cause may be shown by inferences drawn from circumstantial evidence. *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 77.

¶ 41 Whether a defendant's conduct represented a breach of duty and whether that conduct proximately caused the plaintiff's injury or death are generally issues of fact for the jury to decide. *Thompson v. Gordon*, 241 Ill. 2d 428, 438-39 (2011). The proximate cause of an injury can be decided as a matter of law only when the facts are undisputed and there can be no difference in the judgment of reasonable people as to the inference to be drawn from them. *Calloway*, 2013 IL App (1st) 112746, ¶ 78 (citing *Zerbenski v. Tagliarino*, 67 Ill. App. 3d 166, 172 (1978)).

¶ 42 Here, the trial court found that plaintiffs failed to prove legal cause because "[i]t was not foreseeable or reasonable to expect Pledge to believe the Dayton minivan would pull into his lane to complete her turn after yielding to the SUV." We disagree. Based on the testimony of the witnesses and the inference drawn from the evidence, reasonable people could reach different judgments as to the foreseeability that Pledge's pursuit would place civilian drivers in harm's way and the foreseeability that the Dayton minivan would be unable to stop in time to avoid the crash.

16

¶ 43    Pledge testified that he knew high-speed police pursuits were dangerous to other motorist and "certainly could" put innocent people at risk of injury. He stated that as he continued his pursuit at speeds in excess of 100 miles per hour, the SUV turned off its lights. He also testified that he was "pretty convinced" that the SUV he was pursuing at excessive speeds would crash as it proceeded toward Macomb and he was aware of other left-hand-turn collisions at the approaching intersection. O'Hern's reconstruction of the physical evidence revealed that Amanda had a two-second window after the blacked-out SUV passed to visualize Pledge's car and make corrective maneuvers to avoid the impact. Other witnesses provided circumstantial evidence to support the reasonable inference that the accident was foreseeable. Alpert testified that a pursuit through an intersection is like "playing Russian roulette" because, even with emergency lights, third-party reactions are unpredictable. Thus, the jury had a basis for concluding that the crash was of the type that a reasonable person would foresee as a likely result of a high-speed pursuit through an intersection.

¶ 44    In *Suwanski*, the court stated:

"As for legal causation, a jury could also find under these facts that it was reasonably foreseeable that chasing the [violator's] vehicle at high rates of speed through residential and commercial suburban streets, knowing [the violator] was running stop signs and red lights, would result in injury to some third person. Officer Bradford could be found to have reasonably anticipated that [the violator's] conduct and the resulting collision were the natural and probable result of his own conduct in chasing her vehicle under these particular conditions." *Suwanski*, 342 Ill. App. 3d at 256.

17

Similarly, under these circumstances, a rational jury could have concluded that it was reasonably foreseeable that following a fleeing SUV with its lights off, traveling over 100 miles per hour in evening conditions, and approaching a city intersection at a speed more than twice the speed limit would result in injury to some bystander.

¶ 45    Foreseeability is also demonstrated by evidence of the department's pursuit policy. Pledge testified that the policy required officers to conduct a balancing test before engaging in a pursuit of a violator. To engage in a high-speed pursuit, the policy required officers to first determine whether there was a serious felony involving an "actual or threatened attack." Pledge admitted that he had no information about a serious felony involving an actual or threatened attack when he began his pursuit of the SUV. He was also aware that a pursuit should cease when the offense is a misdemeanor and the identity of the violator is known. Such policies reflect the foreseeability of accidents like the one that occurred in this case. See *Rivera*, 401 Ill. App. 3d at 611 (department's pursuit policy is inexorably linked to the foreseeable injuries or death of bystanders as a result of a dangerous pursuit).

¶ 46    Defendants maintain that Amanda had a duty to yield to Pledge's emergency vehicle and that her decision to turn was not foreseeable. However, the facts do not support the argument that Amanda was an intervening cause that broke the chain of causation. The intervention of independent concurrent or intervening forces will not break a causal connection if the intervention of such forces was itself probable or foreseeable. See *Freeman v. City of Chicago*, 2017 IL App (1st) 153644, ¶ 49 (intervening cause of suspect's reckless driving did not break causal connection where it was foreseeable that, in response to officer's high speed pursuit the wrong way down a one-way street, the suspect would continue to drive recklessly and strike an innocent bystander). Amanda testified that the SUV, with its lights off, came out of nowhere at

18

an "insane" rate of speed. She turned her head to follow the SUV and as she turned back, Pledge struck the side of the minivan. Pledge testified that he saw the Dayton minivan with its turn signal engaged as his vehicle and the SUV approached the intersection traveling 100 miles per hour. Given the high rate of speed at which Pledge was traveling and the distraction of the SUV, it was foreseeable that Pledge might hit the minivan as he passed through the intersection moments after the fleeing vehicle. Amanda's continuation through the left-turn lane after the SUV passed was not an intervening force that broke the causation link between Pledge's conduct and the crash that occurred two seconds later. Accordingly, the trial court erred in granting defendants' motion for judgment *n.o.v.* on the element of proximate cause.

¶ 47    Based on the above discussion, we cannot conclude, as a matter of law, that when viewed in the light most favorable to the Daytons, the evidence presented at trial so overwhelmingly favored Pledge and the McDonough County Sheriff's Department that no contrary verdict could ever stand. See *Pedrick*, 37 Ill. 2d at 510. We therefore reverse the trial court's order granting defendants' motion for judgment *n.o.v.*

¶ 48                                  II. New Trial

¶ 49    Plaintiffs also claim that the trial court erred in granting a new trial based on the manifest weight of the evidence.

¶ 50    A new trial should be granted only when the verdict is contrary to the manifest weight of the evidence. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178-79 (2006). A verdict is considered against the manifest weight of the evidence where the opposite result is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based on the evidence. *Maple*, 151 Ill. 2d at 454. It is well settled that "[i]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to

19

decide what weight should be given to the witnesses' testimony." (Internal quotation marks omitted.) *Redmond v. Socha*, 216 Ill. 2d 622, 652 (2005). "Only if the verdict was palpably erroneous and wholly unwarranted, was clearly the result of passion or prejudice, or appears to be arbitrary, unreasonable, and not based upon the evidence will it be overturned." *Friedland v. Allis Chalmers Co. of Canada*, 159 Ill. App. 3d 1, 9 (1987). A court's ruling on a motion for a new trial will not be reversed absent an abuse of discretion. *Maple*, 151 Ill. 2d at 455.

¶ 51    In granting defendants' motion for a new trial, the trial court found that the jury was provided "uncontradicted evidence" that Amanda had sufficient time to perceive and react to Pledge's emergency vehicle. The testimony at trial, however, was not uncontradicted. Defense experts testified that Amanda may have had up to twelve seconds to react. But O'Hern admitted that her line of sight was temporarily blocked by the SUV and that she may have had only two to three seconds to react to Pledge's vehicle after being distracted by the SUV. At trial, the evidence established that a driver has a duty to yield to an emergency vehicle that is immediately approaching. Based on O'Hern's reconstruction testimony, Pledge was traveling 85 miles per hour as he entered the intersection. Expert witness Alpert testified that a normally prudent driver would not have a reasonable amount of time to perceive, react, and stop to avoid Pledge at that excessive rate of speed. Moreover, there is nothing in the record to indicate that the jury failed to consider all of the evidence, including the dash camera video. As O'Hern conceded after watching the video himself, two reasonable people could disagree about whether Amanda had sufficient time to see Pledge's vehicle and stop before making a left-hand turn.

¶ 52    To reverse a jury verdict as against the manifest weight of the evidence, we must find that it is unreasonable, arbitrary, and not based on the evidence or that the opposite conclusion is readily apparent. See *id.* at 454. Here, the evidence supports conflicting inferences about

20

Pledge's attempt to reduce his speed as he entered the intersection and Amanda's ability to perceive the squad car on its immediate approach. The jury was also faced with conflicting testimony as to whether Pledge attempted to avoid the crash and contradictory opinions from the expert witnesses. The jury was free to accept some pieces of evidence and reject others. It was also free to determine the credibility of the witnesses and weigh their testimony. See *Redmond*, 216 Ill. 2d at 652 (it is the jury's function to resolve any conflicts between the witnesses' testimony). Merely because the jury did not find in defendants' favor does not signify a failure to consider the evidence. See *Kahn v. James Burton Co.*, 5 Ill. 2d 614, 623 (1955) (reviewing court will not set aside a verdict merely because the jury could have found differently or because we feel that other conclusions would be more reasonable).

¶ 53    In this case, we cannot say that the jury's determination was unreasonable, arbitrary, and not based on the evidence presented or that the opposite conclusion is clearly apparent. The verdicts were not against the manifest weight of the evidence.

¶ 54                                 III. Legally Inconsistent Verdicts

¶ 55    The question still remains whether a new trial is justified on the basis that the jury's disparate findings as to Amanda's negligence are legally inconsistent.

¶ 56    A "legally inconsistent verdict" is one:

> "in which the same element is found to exist and not to exist, as when a defendant is acquitted of one offense and convicted of another, even though the offenses arise from the same set of facts and an element of the second offense requires proof that the first offense has been committed." Black's Law Dictionary 1791 (10th ed. 2014).

There is no authority for the proposition that verdicts in a civil case must be without any conceivable flaw in logic, only that they must be legally consistent. *Redmond*, 216 Ill. 2d at 650.

21

A "verdict is not legally inconsistent unless it is absolutely irreconcilable." *Tedeschi v. Burlington Northern R.R. Co.*, 282 Ill. App. 3d 445, 449 (1996). Reviewing courts will exercise all reasonable presumptions in favor of a jury's verdict. *Redmond*, 216 Ill. 2d at 643-44. Verdicts will not be considered irreconcilably inconsistent if they are supported by any reasonable hypothesis. *Id.*

¶ 57    In Illinois, comparative negligence allows parties to recover damages that are not attributable to their own fault. *Alvis v. Ribar*, 85 Ill. 2d 1, 16 (1981). A comparative negligence instruction permits the trier of fact to reduce a plaintiff's damages by the percentage of fault attributable to the plaintiff. *Id.* at 25. Under this standard, however, the party seeking to reduce the damage award bears the burden of proving by a preponderance of the evidence the essential elements of an action in negligence. *Boasiako v. Checker Taxi Co.*, 140 Ill. App. 3d 210, 213 (1986). Comparative negligence applies when "[t]he plaintiff's negligence is a legally contributing cause of [her] harm if, but only if, it is a substantial factor in bringing about [her] harm and there is no rule restricting [her] responsibility for it." Restatement (Second) of Torts § 465(1) (1965).

¶ 58    In *Boasiako*, the appellate court upheld a verdict finding the plaintiff in an automobile collision 40% negligent for his own injuries but not guilty on a counterclaim alleging that he caused property damage to defendant's vehicle. *Boasiako*, 140 Ill. App. 3d at 211. On appeal, defendants argued that because the same individual was found 40% at fault in one verdict, but not negligent in the other, the verdicts were legally inconsistent and could not stand. The appellate court held that the two verdicts were consistent, stating that "[t]he principles of comparative negligence do not relieve [counterplaintiff] of proving by a preponderance of the evidence the essential elements of an action in negligence." *Id.* at 213. It noted that the jury could

22

determine that the plaintiff's damages should be reduced based on his own negligence and still conclude that the defendants failed to prove the elements of their counterclaim. *Id.*

¶ 59     Here, as in *Boasiako*, the jury's decisions as to whether Amanda contributed to the death of Jill and whether she contributed to her own injuries addressed distinctly different claims. They are reconcilable because the jury could have rationally decided that defendants did not prove by a preponderance of the evidence one or more elements of the comparative negligence defense against the wrongful death claim, even though it determined that defendants satisfied the burden of proof of the comparative negligence defense against the bodily injury claim.

¶ 60     On the claim of wrongful death, Amanda and Clingan testified the Pledge pursued the SUV through the University Avenue intersection at an excessive rate of speed. As he approached the intersection, Pledge announced on the dash camera video that he was traveling 100 miles per hour. Alpert further testified that no reasonable person could have detected Pledge's squad car and reacted in enough time to avoid the collision in the two seconds Amanda had to see Pledge after the SUV passed through her line of sight at the intersection. Thus, the jury could have made the reasonable hypothesis that defendants failed to meet their burden of proving that Amanda disregarded the safety of her mother or that her breach of duty was a proximate cause of Jill's death.

¶ 61     On Amanda's claim for her own injuries, she testified that she suffered a fractured scapula and experienced nightmares and flashbacks after the accident. Her psychiatrist, Dr. McFaul, testified that Amanda first sought medical treatment for her post-traumatic stress in 2006, two years after the accident. He noted that Amanda reduced her Zoloft medication in January 2010 and had discontinued her medication when he saw her on April 12, 2010. At that time, Amanda had escalated symptoms of anxiety and could not eat. He testified that once she

started taking her medication again, as previously prescribed, her condition improved. Thus, the jury could have found that Amanda's failure to timely seek and maintain psychiatric care contributed to her emotional injuries.

¶ 62　　Based on the evidence presented to the jury, it is not inconsistent to assess a percentage of fault to Amanda for one claim but not the other. The jury could have reasonably determined that Jill's death was solely caused by Pledge, while concluding that Amanda's failure to seek and follow the advice of her doctor contributed to her emotional pain and suffering. Thus, the jury's verdict was supported by a reasonable hypothesis that Amanda contributed to her own injuries but did not contribute to the death of Jill. See *Lee*, 152 Ill. 2d at 470 (where the jury has a reasonable basis for its award, a reviewing court will not disturb its verdict). The verdicts are not inconsistent and do not require a new trial.

¶ 63　　　　　　　　　　　　　　　　CONCLUSION

¶ 64　　The judgment of the circuit court of McDonough County is reversed, and the cause is remanded with directions to reinstate the jury's verdicts on both claims, as well as the order allocating damages. On remand, the court is directed to award postjudgment interest from the date of the final judgment, March 27, 2017, to the date of satisfaction. See 735 ILCS 5/2-1303 (West 2016).

¶ 65　　Reversed and remanded with directions.