2021 IL App (1st) 173017-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
March 30, 2021

No. 1-17-3017

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 06 CR 26598 |
| | ) | |
| TRISTAN SCAGGS, | ) | The Honorable |
| | ) | Dennis J. Porter, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**MODIFIED ORDER UPON DENIAL OF REHEARING**

¶ 1    *Held:*  Trial court's second-stage dismissal of postconviction petition alleging various claims of ineffective assistance of trial and appellate counsel is affirmed.

¶ 2    The petitioner, Tristan Scaggs, appeals from the trial court's second-stage dismissal of his second amended petition for relief under the Post-Conviction Hearing Act. 725 ILCS 5/122-1 *et seq.* (West 2016). He contends that four claims asserted in that petition make a substantial showing that he was denied his constitutional right to effective assistance of counsel in both the trial and appellate courts. For the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                              I. BACKGROUND

¶ 4        Following a jury trial, petitioner was convicted of attempted first degree murder of a police officer and conspiracy to commit murder. He was sentenced to concurrent terms of 38 years and 15 years, respectively. On direct appeal, this court reversed his conviction for conspiracy to commit murder after concluding that the trial court had erred in admitting into evidence certain wiretapped phone conversations involving petitioner and four alleged coconspirators, where the State failed to present sufficient independent evidence of a conspiracy involving petitioner. *People v. Scaggs*, 2011 IL App (1st) 090666-U, ¶¶ 29-30, 34. Accordingly, the court vacated his sentence on the conviction for conspiracy to commit murder. *Id.* ¶ 49. However, the court affirmed petitioner's conviction on the charge of attempted murder. *Id.* ¶ 90.

¶ 5        The charges against petitioner arose out of a course of events that occurred on October 30, 2006. The conspiracy to commit murder charge involved a target alleged to be Dwandric McDowell. The indictment for that count alleged that petitioner and his codefendants, Melvin Martin and Lamel Burns, had agreed with each other to commit first degree murder and, in furtherance of that agreement, petitioner armed himself with a 9-millimeter handgun and drove with other armed individuals to McDowell's location, while Burns and Martin directed them to that place. The attempted murder charge arose out of events that occurred when police pulled over a car in which petitioner had been a front-seat passenger. One of the police officers involved was Sergeant Michael Bocardo. The indictment charging attempted murder alleged that petitioner pointed a 9-millimeter semi-automatic pistol at Sergeant Bocardo while he was in the course of performing his duties as a peace officer. Petitioner was tried simultaneously, but separately, with codefendants Martin and Burns.

¶ 6        Prior to trial, the State filed a proffer seeking to allow the admission of oral communications

among the coconspirators, including petitioner, which were intercepted by police via electronic surveillance of multiple cellular telephone conversations had among the men. In this proffer, the State argued that these communications showed a conspiracy, that the statements contained therein were made in furtherance of that conspiracy and that, when viewed in conjunction with other evidence, this was sufficient to establish a conspiracy. Petitioner objected to the admission of the recorded communications on several grounds, including that independent evidence of a conspiracy, which was missing from this cause, was required in order for the statements to be admissible at trial. After initially denying the State's request, the trial court ultimately ruled that the State could admit the recorded conversations into evidence.

¶ 7        The cause then proceeded to trial. In the State's case in chief, Officers Michael Cronin and Xavier Elizondo, gang experts, testified that a violent gang war was occurring in the summer of 2006 between the New Breeds and Traveling Vice Lords street gangs. McDowell was identified as a ranking member of the Traveling Vice Lords, who controlled the area around Iowa and Pulaski. Identified as members of the New Breeds were codefendants Burns and Martin (ranking members), as well as Marquell Harper, Marcus and Markel Thomas, and William Tyler. Petitioner was also identified as associated with the New Breeds. Some 20 shootings were exchanged between these rival gangs that summer, resulting in several murders.

¶ 8        During this time, police obtained permission from the courts to conduct a wiretap of Martin's and Burns' cell phones. Detective Gregory Jacobson testified that he was one of the officers who listened to the calls as they were received. He stated that he heard a conversation on October 20, 2006, between Martin and an unidentified person discussing Markel Thomas' arrest for the shooting of McDowell's sister several months earlier. Other calls included discussions about Tyler, who had been interviewed by police, and about the recent murder of Harper.

¶ 9    The State called gang member Ronald James to ask about the gang war and a statement he had given about it following an unrelated arrest.

¶ 10    Officer Eric Walker testified that, on October 29, 2006, he was working surveillance monitoring a black Pontiac Grand Prix. He stated that a van and another car approached the Grand Prix. About seven men, including Burns and Martin, exited the vehicles and met in a nearby park for a while, whereupon they left the area.

¶ 11    Detective Jacobson further testified that police had initiated surveillance of the black Grand Prix back on October 22, 2006, after it was reported stolen. On the morning of October 30, 2006, Detective Jacobson intercepted a series of phone calls between Martin, Burns, Marcus Thomas and petitioner. He stated that the men were discussing trying to get together at 3 p.m. that day to drive around; they also discussed "bust downs" and petitioner mentioned that he was "looking for some b*tches to f*ck with," which Detective Jacobson interpreted to mean that the men wanted to look for rival Traveling Vice Lords to harm. That afternoon, Martin and Burns discussed Martin's "baby momma;" when Martin asked Burns "where she at," Burns replied that she was "where you were looking for it yesterday." Petitioner called Martin and told him he was "fittin' to slide through that way and see what's up." Petitioner called again at 2:04 p.m. and told Martin he was "fittin' to slide now;" Martin told petitioner he would need someone to ride with him. Minutes later, Martin called Burns and told him that someone would be in "motion" in about 10 minutes to "gather them," and Burns replied that "she just sitting." Burns called Martin at 2:24 p.m. and told him to "hold the horses for a hot second" because "she just got some company * * * baby's daddy pulled up." Martin then called petitioner, and petitioner asked him, "[y]ou all fitting to grab the gloves?" Martin replied that someone was doing that now; petitioner then called Burns and told him that "it's all good on the gloves."

¶ 12    Detective John Graham testified that on October 30, 2006, he was on surveillance of the black Grand Prix, which was parked outside a building on West Walton. He stated that, at approximately 3 p.m., a car arrived and four men, including Burns and petitioner, exited the vehicle and went inside the building. Burns later emerged and drove off in the other car, while the three other men, including petitioner, got into the Grand Prix and began to drive around.

¶ 13    McDowell testified that, as a member of the Traveling Vice Lords, he controls the area around Iowa and Pulaski and is present there on a daily basis. He testified that Markel Thomas, a member of the New Breeds, had shot his sister earlier that summer. On October 30, 2006, McDowell left his grandmother's house around 2 or 2:30 p.m. to pick up his children, which he estimated would take about 15 to 30 minutes. Between 3 and 4 p.m., he arrived at Iowa and Pulaski, and walked to a gas station on nearby Harding. McDowell stated that he did not know petitioner and he did not see a black Grand Prix driving down Iowa that day.

¶ 14    Police intercepted more phone calls between Burns and petitioner on October 30, 2006. Burns called petitioner at 3:16 p.m. and told him "Harding." A few minutes later, petitioner called Burns asking "[y]ou said Harding right?" Burns told petitioner he would call him right back because "she's pulling off." When Burns returned petitioner's call, he told petitioner, "[o]n the Ave" and "Pulaski!" Meanwhile, Martin called Marcus Thomas and told him "this n****r * * * on * * * Pulaski and * * * Iowa now, parked * * * across the street from the gas station."

¶ 15    Lieutenant Joseph Gorman testified that he assumed surveillance of the now-traveling Grand Prix, which was proceeding on Augusta, then south to Iowa, westbound on Iowa to Harding and south to Chicago Avenue. Based on the car's path and the communication he was receiving about contemporaneous wiretap overhears, Gorman believed the occupants of the Grand Prix were being directed to do a shooting at Iowa and Pulaski. When the Grand Prix stopped at a red light on

Augusta and Kedzie, Lieutenant Gorman decided that a stop of the Grand Prix should be conducted and began notifying police officers in the area.

¶ 16    Sergeant James Sanchez, who was also following the Grand Prix, testified that when the police order was given to conduct the stop, he approached the driver's side from the front with a shotgun and could see the driver, passenger and rear passenger. He stated that the driver was wearing red rubber gloves and the rear passenger had red rubber gloves in his pocket. He heard the driver, whom he identified as Tyler, lean back and yell "[g]et these b*tches," as he reached for his waistband. Sergeant Sanchez heard Lieutenant Gorman, who had approached the Grand Prix on the rear driver's side, yell that there was a gun and saw the barrel of a rifle breaking the window of the back seat. Sergeant Sanchez fired at the rear passenger and then a second shot when he saw the rifle come up again. Lieutenant Gorman corroborated Sergeant Sanchez's testimony, and described that the rear passenger, whom he identified as Thomas, pointed the assault rifle at him, so he too fired two or three times. He then fired at Tyler, who did not show his hands, and heard Sergeant Bocardo warn that the third man, in the front passenger seat (petitioner), was armed with a weapon. After the shooting stopped, Sergeant Sanchez went to the rear of the Grand Prix and took the rifle from Thomas' hand. Sergeant Sanchez admitted on cross-examination that he never saw a gun in petitioner's hands. It was also later determined that the driver did not have a weapon.

¶ 17    Sergeant Bocardo was also assigned to survey the Grand Prix. He testified that when he arrived at the scene, he saw Lieutenant Gorman and Sergeant Sanchez and heard gunfire. From his stance, he saw the front passenger, whom he identified as petitioner, get out of the car and come in his direction. Sergeant Bocardo testified that petitioner was wearing red latex gloves and was holding a gun. Sergeant Bocardo stated that when he told petitioner to drop the gun, petitioner did not and instead raised it in Sergeant Bocardo's direction. Sergeant Bocardo averred that,

"believ[ing]" petitioner shot at him, he shot twice at petitioner, and petitioner fell to the ground. Sergeant Bocardo further testified that petitioner was still holding the gun and raised it up toward him a second time. Sergeant Bocardo fired again and then approached petitioner; he noticed that there was a hole in the upper center on the right side of petitioner's back. On cross-examination, Sergeant Bocardo stated that another detective opened the passenger side door of the Grand Prix before petitioner exited; whereupon the gunfire erupted. He further admitted that petitioner's torso was not facing him when he shot petitioner.

¶ 18    Detective James Egan testified that he arrived at the scene after the shooting had stopped. The Grand Prix was pointed eastbound on Augusta near Kedzie, and petitioner was on the ground about to be placed into handcuffs. Detective Egan stated that he pulled a 9-millimeter handgun from underneath petitioner's left side. He then rode with petitioner to the hospital, where he recovered his clothing, a cell phone and a pair of red latex gloves. Evidence was presented that both Tyler and Thomas died at the scene.

¶ 19    Forensic evidence indicated that ten firearms were recovered from the scene, as well as 69 shell casings, multiple bullets and bullet fragments. All the casings came from firearms logged to police officers. Also recovered were a rifle and a 9-millimeter pistol with a magazine and six unfired cartridges. Testing confirmed that while Tyler and Thomas could not be excluded from the DNA profiles that were extracted from both the rifle and pistol, petitioner was excluded, as his DNA was not on either weapon.

¶ 20    After the State rested its case in chief, petitioner moved for a directed verdict. The trial court denied his motion. As for his case in chief, petitioner presented stipulated testimony that he was treated for a bullet wound to the back; the bullet remains lodged in his right hip.

¶ 21    In closing arguments, the prosecutor made various comments describing petitioner as a

"killer" and "soldier" for the New Breeds street gang who went out to "hunt for another human being to kill." He discussed the gang experts' testimony and the planned hit on McDowell. He also quoted from and discussed the recorded phone calls that had been played for the jury. The prosecutor stated that the case was about petitioner "going out to kill Dwandric McDowell, then when the police get involved him trying to kill the police officer."

¶ 22    The jury convicted petitioner of conspiracy to commit murder and attempted first degree murder of a police officer. As stated above and discussed in greater detail below, petitioner's conviction for conspiracy to commit murder was reversed on direct appeal, on the basis that the trial court had erred in allowing the wiretap recordings to be admitted into evidence without independent evidence of a conspiracy involving petitioner. *Scaggs*, 2011 IL App (1st) 090666-U, ¶¶ 26-49. However, the court rejected petitioner's remaining arguments and affirmed his conviction for attempted murder. More specifically, the court found no error in allowing the police officer witnesses to refer to the Grand Prix as being "stolen." *Id.* ¶¶ 53-60. It held that his trial counsel had not been ineffective by not requesting a jury instruction on aggravated assault as a lesser included offense to the charge of attempted murder of a police officer. *Id.* ¶¶ 64-78. And it held that the State's evidence at trial was sufficient to prove him guilty beyond a reasonable doubt of attempted murder. *Id.* ¶¶ 79-88.

¶ 23    On April 29, 2013, petitioner filed a counseled petition for postconviction relief, which he amended soon thereafter. The matter was then continued on various occasions, and on March 15, 2016, petitioner filed a second amended petition for postconviction relief, which he was later granted leave to supplement. His second amended petition presented four claims that are pertinent to this appeal. First, the petition presented a claim that petitioner's appellate counsel had provided ineffective assistance by failing to argue that his conviction for attempted murder should have been

reversed based on the trial court's improper admission of the wiretap evidence. Second, it presented a claim that his trial counsel had been ineffective for not calling three police officers as witnesses, each of whom had given a statement describing a version of events that, according to petitioner, impeached Sergeant Bocardo's testimony that petitioner pointed a gun at him while he was exiting the Grand Prix instead of complying with officers' demands to immediately lay on the ground. The officers' statements were attached to the petition. Third, it presented a claim that his trial counsel had been ineffective for failing to investigate and present evidence that Sergeant Bocardo had, on another occasion, fired shots at a suspect later discovered to have been unarmed, which he justified by saying he believed that the suspect had fired on him or that he saw an object in the suspect's hands that he believed was a gun. Finally, the petition presented a claim that petitioner's trial counsel had been ineffective for failing to argue that petitioner had been denied due process when the State allowed the Grand Prix to be destroyed after trial counsel had requested to inspect it, and for failing to argue that the destruction of the car warranted an adverse inference instruction to the jury.

¶ 24    The State filed a motion to dismiss the second amended petition. It raised a variety of arguments, including that the petition failed to allege the necessary deficient conduct or prejudice to support any claims for ineffective assistance of counsel. As to petitioner's first claim, the State argued, among other things, that the petitioner failed to show a reasonable likelihood that appellate counsel would have been successful in arguing that the use of inadmissible wiretap evidence warranted reversal of the conviction for attempted murder. As to the second claim, the State argued that the three officers' statements upon which petitioner relied were consistent with and did not impeach Sergeant Bocardo's testimony. As to the third claim, the State argued that evidence of the conduct of Sergeant Bocardo in other cases would not have been admissible in petitioner's case.

As to the final claim, the State argued that petitioner's trial counsel would have had to show that the Grand Prix was destroyed in bad faith or that it had materially exculpatory worth, and the petition failed to demonstrate that this could have been done.

¶ 25    The petitioner responded to the State's motion to dismiss, and the trial court conducted oral argument on the motion. At the conclusion of oral arguments, the trial court found that the petition had not made a substantial showing of a violation of petitioner's constitutional rights and granted the State's motion to dismiss. This appeal then followed.

¶ 26                                II. ANALYSIS

¶ 27                              A. Standard of Review

¶ 28    On appeal, petitioner contends that the trial court erred by granting the State's motion to dismiss his postconviction petition instead of advancing it for an evidentiary hearing, because it made a substantial showing of a constitutional deprivation. The Post-Conviction Hearing Act is a method by which a person under criminal sentence may challenge his conviction or sentence by showing that, in the proceedings resulting in his conviction, there was a substantial denial of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2016). A postconviction proceeding involves three stages. *People v. Domagala*, 2013 IL 113688, ¶ 32. This case is at the second stage, at which the State is permitted to file an answer to the petition or move to dismiss it. 725 ILCS 5/122-5 (West 2016).

¶ 29    In considering a motion to dismiss by the State, the court must determine whether the petition and any accompanying documentation make a " 'substantial showing of a constitutional violation.' " *Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). This standard is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle the petitioner

to relief. *Id.* ¶ 35. The second-stage inquiry does not require the trial court to engage in any factfinding or credibility determinations. *Id.* All well-pled facts that are not positively rebutted by the original trial record are taken as true. *Id.* If the petition makes a substantial showing of a constitutional violation, it is advanced to a third-stage evidentiary hearing at which the trial court serves as factfinder and determines whether the evidence introduced demonstrates that the petitioner is entitled to relief. *Id.* ¶ 34. Where, as here, the trial court dismisses a postconviction petition at the second stage upon a finding that no substantial showing of a constitutional deprivation has been made, our review is *de novo*. *People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 30        The constitutional right of which petitioner claims he suffered a substantial denial is the right to effective assistance of counsel. A criminal defendant is guaranteed the right to effective assistance of counsel under both the federal and state constitutions (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8), and this right applies both in the trial court and on direct appeal of right to the appellate court. *People v. Jackson*, 205 Ill. 2d 247, 258-59 (2001). The familiar two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984), is used to evaluate claims of ineffective assistance of counsel, and it applies to both trial counsel and appellate counsel. *People v. Petrenko*, 237 Ill. 2d 490, 496-97 (2010).

¶ 31        That test is composed of two prongs: deficiency and prejudice. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). First, the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the "counsel" guaranteed by the sixth amendment. *Id.* A court measures counsel's performance by an objective standard of competence under prevailing professional norms. *Id.* To establish deficiency, the defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *Id.*

¶ 32　　Second, the defendant must establish prejudice. *Id.* The defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The prejudice prong of *Strickland* entails more than an "outcome-determinative" test. *Id.* The defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Id. Strickland* further requires that actual prejudice be shown, not speculation as to prejudice. *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 33　　A defendant must satisfy both prongs of the *Strickland* test to prevail. *Evans*, 186 Ill. 2d at 94. However, if an ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, the court need not decide whether counsel's performance was deficient. *Id.* Petitioner makes four contentions in support of this claim, which we address in order below.

¶ 34　　　　　　　B. Effect of gang-related evidence on attempted murder conviction

¶ 35　　First, petitioner argues that his appellate counsel was ineffective for failing to argue that the evidence of wiretapped phone conversations, which this court held was improperly admitted as evidence of a conspiracy, also prejudiced his attempted murder conviction and required a new trial on that count.

¶ 36　　On direct appeal, this court agreed with the arguments made by petitioner's appellate counsel that the trial court committed reversible error by admitting into evidence the wiretapped phone conversations involving Burns, Martin, Tyler, Thomas, and petitioner. *Scaggs*, 2011 IL App (1st) 090666-U, ¶¶ 29-30, 34. The court held that these recordings were inadmissible under the coconspirator exception to the hearsay rule, because the State failed to provide proof of a conspiracy between petitioner and the alleged non-testifying co-conspirators that was independent

of the conversations themselves. *Id.* ¶ 38. Specifically, the court found no independent proof that petitioner had joined with any of the others in a common agreement to kill McDowell. *Id.* ¶ 39. Also, no witness had testified that petitioner was a member of the New Breeds or any other gang. *Id.* ¶ 40. Only the most minimal evidence was presented that petitioner ever met with ranking members of the New Breeds, and the alleged target of the conspiracy (McDowell) testified that he did not know petitioner. *Id.* Thus, this court reversed petitioner's conviction for conspiracy to commit murder and vacated his sentence for that conviction. *Id.* ¶ 49.

¶ 37      Petitioner now contends that his appellate counsel was ineffective for failing to go further and specifically argue that this error caused petitioner such prejudice that a new trial was required on his attempted murder conviction. He argues that his appellate counsel could have established prejudice pertaining to the attempted murder conviction based on a combination of (1) the harmful nature of the wiretap evidence and (2) the absence of overwhelming evidence on the attempted murder charge. He contends that the State made the wiretap evidence the "centerpiece" of his whole trial, by playing audio clips 76 times during the trial, displaying transcripts of the recorded calls with the speakers' names labeled, and eliciting police officers' interpretations of what was being discussed in the conversations, which was often unclear from the language used. He contends that the State, in closing arguments, used the recorded conversations as a basis for portraying petitioner, at the time of the incident giving rise to the charge of attempted murder, as being "out to kill Dwandric McDowell," being "on the hunt for another human to kill," being on "a mission of murder," and being a "solder that fights for an infestation called the New Breeds, one of the street gangs in this city."

¶ 38      He contends that the improperly-admitted wiretap evidence allowed the State to dwell extensively on gang wars and actions at his trial, which would not have been possible without

evidence connecting the gang-related actions to petitioner and the crime with which he was charged. See *People v. Smith*, 141 Ill. 2d 40, 58 (1990). He cites a variety of examples, including the extensive testimony by Officers Cronin and Elizondo about the gang wars that were occurring around the time of this incident, the fact that McDowell (a member of the Traveling Vice Lords) and James (a former member of the New Breeds) testified in his case, and the fact that the prosecutor made multiple references in closing argument to the gang war, gang retaliation, and petitioner being a "soldier for the New Breeds." Petitioner contends that the gang-related evidence, which was made possible only because of the improperly-admitted wiretap evidence, "was such a large part of the trial that it could not be ignored by the jury," and that his appellate counsel should have argued that "the trial court's error infected not just the conspiracy conviction, but the attempt murder conviction also."

¶ 39     Exacerbating the prejudice caused by the amount of gang-related evidence that the jury was improperly allowed to hear on the attempted murder charge, he argues, was the "far from overwhelming" evidence on that charge. He points out that Sergeant Bocardo was the only police officer who testified he saw petitioner flee the Grand Prix and point a gun at him. He contends that Sergeant Bocardo's testimony was contradicted by Detective Graham, who saw petitioner start to exit the car but did not see him try to run. He also points out that forensic evidence excluded petitioner's DNA from both guns recovered at the scene, but it did not exclude Thomas' DNA from the rifle or Tyler's DNA from the handgun. He also contends that the fact that he never pointed a gun at Sergeant Bocardo is supported by the testimony of Lieutenant Gorman and Sergeant Sanchez that they saw Tyler reach for his waistband, that they fired shots only at Tyler and not at petitioner, that Lieutenant Gorman ordered Tyler to show his hands but did not mention giving that same order to petitioner, the fact that Sergeant Sanchez never testified that he saw

petitioner with a gun, and the fact that the car was bullet-ridden on the front, rear, and driver's side, but not the passenger side where petitioner had been. Petitioner further claims that Sergeant Bocardo's testimony makes no sense, as the evidence showed that a bullet entered below petitioner's right shoulder and traveled toward his hip despite the fact that Sergeant Bocardo testified that petitioner was running away from him.

¶ 40        We reject petitioner's arguments and hold that it was not objectively unreasonable for his appellate counsel not to argue that he should receive a new trial on his attempted murder conviction based on the erroneous admission of the recorded phone conversations among petitioner, Burns, Martin, Tyler, and Thomas. The *Strickland* standard discussed above (*supra* ¶¶ 30-33) applies to claims of ineffective appellate counsel, and a petition raising such a claim must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful. *Petrenko*, 237 Ill. 2d at 497. Appellate counsel is not obligated to brief every issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Peeples*, 205 Ill. 2d 480, 513-14 (2002). As with trial strategy, normally appellate counsel's choices about which issues to pursue on appeal are entitled to substantial deference. *People v. Rogers*, 197 Ill. 2d 216, 223 (2001).[1]

¶ 41        Neither party directs our attention to any Illinois case that has considered the question of when an error requiring the reversal of one conviction causes such prejudice as to warrant the granting of a new trial on other counts not directly affected by the error. Thus, neither party

---

[1] We take judicial notice that appellate counsel did not wholly fail to make this argument. Petitioner's opening brief did argue that this court should reverse petitioner's "convictions" as a result of the prejudicial admission of improper hearsay evidence, but the argument then discussed the recorded calls only as they affected the conspiracy conviction. It concluded by arguing that "admission of the hearsay statements infected the entire proceedings," and that because harmless error could not be shown, "reversal is required."

advances an argument for a legal standard against which to consider appellate counsel's evaluation of the merits of this question. Factors that reviewing courts have considered when addressing this question include (1) the tendency of the improperly-admitted evidence to incite or arouse the jury into convicting on the remaining count, (2) whether the evidence on the vacated count was similar to or distinct from the evidence required to prove the remaining count, and (3) the strength of the State's case on the remaining count. See *United States v. Rooney*, 37 F.3d 847, 855-56 (2d Cir. 1994). Considering the faith that courts place in juries to follow instructions and evaluate each count on the specific evidence attributable to it, the issue turns not merely on whether the jury heard improperly-admitted evidence, but on whether the circumstances indicate that the jury likely made use of the improperly-admitted evidence in reaching a verdict on the remaining count. See *id.* at 856.

¶ 42     Here, we agree that the evidence involving the gang wars and petitioner's association with members of the New Breeds, which the jury heard at trial based on the recorded conversations that the trial court erroneously allowed, was inflammatory evidence that would tend to cast petitioner as a bad person. However, even without that gang-related evidence, the jury still would have heard evidence that petitioner was riding in a car with another individual who was armed with an assault rifle, pointed it at the police when the car was pulled over, and refused to put it down resulting in a shootout in which approximately 69 shots were fired by about 9 police officers. The fact that the jury still would have heard this evidence tends to somewhat blunt the inflammatory impact that the gang-related evidence may have had. Thus, we cannot say that the gang-related evidence was so inflammatory relative to the other evidence that the jury heard on the attempted murder charge that it causes us to suspect that that the jury's conviction on the attempted murder charge was the result of the jury being aroused or incited by the gang-related evidence, instead of being the result

of the evidence on the attempted murder charge itself.

¶ 43    The attempted murder count arose out of a different fact pattern than the conspiracy to commit murder count, and distinct evidence was required to prove each count. This would tend to bolster the court's faith that the jury could keep the evidence pertaining to each count separate and avoid using the gang-related evidence to convict on the attempted murder charge. The indictment charging petitioner on the attempted murder count alleged that he pointed a 9-millimeter semi-automatic pistol at Sergeant Bocardo, a person he knew or reasonably should have known to be a peace officer, while Sergeant Bocardo was in the course of performing his duties. By contrast, the indictment charging conspiracy to commit murder alleged that petitioner, Martin, and Burns had agreed with each other to commit first degree murder and, in furtherance of that agreement, petitioner armed himself with a 9-millimeter handgun and drove with other armed individuals to McDowell's location, while Burns and Martin directed them there. Thus, the evidence needed to prove the count of attempted murder pertained specifically to whether petitioner pointed a handgun at Sergeant Bocardo after the officers pulled over the Grand Prix and petitioner exited it from the front passenger side. The evidence needed to prove that count was entirely separate and distinct from the evidence on the conspiracy to commit murder charge, involving whether petitioner had reached an agreement to commit first-degree murder and taken an act in furtherance of that conspiracy by arming himself with a handgun and driving with other armed men to the location where McDowell was believed to be.

¶ 44    Finally, the strength of the State's evidence on the attempted murder charge warrants a conclusion that the jury based the attempted murder conviction on that evidence and not on improper considerations of gang-related evidence. In our decision on direct appeal, we summarized the evidence on the attempted murder charge as follows:

"The testimony indicated that defendant was present in the Grand Prix with two known gang members. Once the vehicle was curbed and police began to approach it, shots were fired. Defendant was seen 'bail[ing] out' of the Grand Prix wearing red latex gloves and holding a pistol in his hand. Instead of submitting to police, he ran towards Sergeant Bocardo. Moreover, instead of heeding Sergeant Bocardo's repeated yells to throw down his weapon, defendant did not and actually raised it and pointed it at Sergeant Bocardo. In addition, once Sergeant Bocardo shot at defendant, defendant dove to the ground, still holding the pistol. Even at this point, instead of relinquishing the weapon and submitting to police, he, for a second time, raised it and pointed it at Sergeant Bocardo. All the while defendant pointed the pistol at Sergeant Bocardo, it was fully loaded, had a live round in the chamber, and its safety was off." *Scaggs*, 2011 IL App (1st) 090666-U, ¶ 84.

Sergeant Bocardo's testimony was corroborated by the testimony of Lieutenant Gorman that he hear Sergeant Bocardo yelling, with respect to petitioner, that "he has still got a gun, be careful." This was not a case in which the evidence of attempted murder was so paltry that the court is left with the suspicion that the jury's conviction on that charge was likely the product of its consideration of the gang-related evidence, instead of the evidence of attempted murder itself.

¶ 45    In light of our analysis of the factors bearing on this question, we see nothing objectively unreasonable in the fact that petitioner's appellate counsel refrained from arguing that petitioner should be given a new trial on his attempted murder charge based on the prejudice to that conviction caused by the gang-related evidence made admissible by the trial court's erroneous admission of the wiretap evidence. Appellate counsel could have reasonably concluded that such an argument would not have been accepted by the court and that therefore counsel's efforts at obtaining reversal of the attempted murder conviction were better directed on more meritorious

arguments. The petition therefore fails to make a substantial showing of ineffective assistance of appellate counsel, and the trial court did not err in dismissing this claim.

¶ 46                    C. Failure to call three police officers as defense witnesses

¶ 47    Second, petitioner argues that his trial counsel was ineffective for failing to call at trial three police officer witnesses whose testimony, he contends, would have contradicted the testimony of Sergeant Bocardo that, as petitioner exited the car and fled, he was holding a gun in his hand that he pointed at Sergeant Bocardo on two occasions. In summary, Sergeant Bocardo testified that he told petitioner to drop the gun, but petitioner did not and instead raised it at him. Believing that petitioner had shot at him, Sergeant Bocardo fired two shots at petitioner. Petitioner then dove to the ground, still holding the gun. After the gunfire stopped, petitioner attempted to get up and flee away from Sergeant Bocardo's location, at which time he pointed the gun at Sergeant Bocardo a second time. Sergeant Bocardo fired two more shots at petitioner, one of which struck petitioner in the back.

¶ 48    Attached to petitioner's postconviction petition were reports of interviews with three police officers not called as witnesses at petitioner's trial. These appear to be handwritten notes by other officers who conducted interviews with the officers involved, as well as typewritten summaries of the interviews. Petitioner, noting that his trial counsel's theory of defense on the attempted murder charge was that the State's story was inaccurate and unbelievable and that Sergeant Bocardo's testimony did not make sense, argues that his trial counsel was ineffective for failing to call these three witnesses, whose testimony would have supported the theory that Sergeant Bocardo had fabricated his testimony.

¶ 49    The first police officer whom petitioner claims his counsel was ineffective for failing to call as a witness is Detective John Roberts. The interview report of Detective Roberts indicates that

that he approached the car, opened the front passenger door, announced his office, and numerous times ordered the occupants to put up their hands. He heard another officer yell "he's got a rifle," and he saw the car's driver leaning back and reaching into his waistband, "again not complying to police orders." It states that he looked in the back seat and saw the rear passenger raise an AK-47 assault rifle and heard gunfire from the driver's side of the car. The rear passenger was still raising his rifle, and Detective Roberts heard the driver state "get these b*tches." It states that Detective Roberts and other officers ordered "armed off to drop weapon," but "off. does not comply." It states that fearing for life and safety of others, Detective Roberts fired his service weapon twice "at the armed offender—assault weapon—at that time front passenger—[illegible] offenders exits the car—numerous shots fired at the armed-non complying offenders." The report also states "that the front passenger had red colored rubber gloves on and a black skull cap on also."

¶ 50    Petitioner asserts that the significance of this report is that Detective Roberts mentions observing the front passenger wearing red gloves on his hands but mentions nothing about that person possessing a gun. Petitioner interprets this to mean that Detective Roberts saw petitioner's hands and that they were empty. He also urges that the statement's use of the singular "armed offender" and the fact that Detective Roberts fired shots only at the rear passenger indicates that he never saw petitioner with a gun. He further contends that the fact that Detective Roberts was positioned by the passenger door, saw petitioner's hands, and did not fire a shot at petitioner indicates that he did not consider petitioner to be one of the "armed-non complying offenders" described in the report.

¶ 51    The second police officer whom petitioner claims his counsel was ineffective for failing to call as a witness is Officer Randy Troche. The interview report with Officer Troche states that as he arrived on the scene, shots were already being fired. He saw that the car's driver appeared to be

reaching into the seat, and he fired at the driver. He then went to the passenger side of the car. The report states, "That's when front passenger came out of car face down on ground." Petitioner contends that this statement contradicts the testimony of Sergeant Bocardo that petitioner exited the car and ran toward him. Petitioner also contends that Officer Troche said nothing about petitioner wielding a handgun. However, we note that the report also states that Officer Troche observed Detective Egan recover a weapon from under the front passenger lying on the street.

¶ 52    The third police officer whom petitioner claims his counsel was ineffective for failing to call as a witness is Detective Gary Bush. The interview report of Detective Bush explains that he was positioned near the trunk of the vehicle and was primarily focused on the rear passenger with the rifle. He explained that he fired 16 rounds into the vehicle and then relocated to the rear passenger side where he helped pull the rear passenger out of the vehicle. The report notes that Detective Bush stated that "he observed the front passenger exit the vehicle and on the ground prior to pulling the rear passenger out of the car." Petitioner argues that the significance of this statement is this final sentence and the fact that Detective Bush mentions nothing about the front passenger fleeing or holding a handgun.

¶ 53    Petitioner argues on appeal that each of the three reports discussed above was available to his trial counsel prior to trial. He contends that each of the officers' statements support his theory of defense that Sergeant Bocardo was not telling the truth, because each officer's statement contradicts the testimony of Sergeant Bocardo that petitioner attempted to flee in his direction after exiting the car, pointed a gun at Sergeant Bocardo as he did so, or pointed a gun at Sergeant Bocardo a second time as he was attempting to stand up after diving to the ground. He reiterates his argument concerning the overall weakness of Sergeant Bocardo's testimony. S*upra* ¶ 39.

¶ 54    The rule is that decisions about which witnesses to call at trial and what evidence to present

on a criminal defendant's behalf are generally viewed as matters of trial strategy that are immune from claims of ineffective assistance of counsel. *People v. Munson*, 206 Ill. 2d 104, 139-40 (2002). However, trial counsel may be deemed ineffective for failing to present exculpatory evidence of which counsel is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense. *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999). Also, the failure to investigate a possible defense of which counsel had reason to know can constitute ineffective assistance. *Domagala*, 2013 IL 113688, ¶ 38.

¶ 55    We reject petitioner's argument that he received ineffective assistance of counsel as a result of the fact that his trial counsel did not call Detective Roberts, Officer Troche, or Detective Bush as witnesses on petitioner's behalf. The clearest case is the decision not to call Officer Troche, whose report, although not mentioning that he saw petitioner "wielding" a weapon, stated that he observed Detective Egan recover a weapon from under petitioner when he was lying on the street. Counsel's decision not to call a witness who would have given testimony harmful to petitioner's case cannot amount to ineffective assistance. *People v. Guest*, 166 Ill. 2d 381, 400 (1995).

¶ 56    As for Detective Roberts and Detective Bush, we find that petitioner overstates the extent to which their testimony would have helped his defense. It is evident from their reports that neither officer's attention was focused on petitioner's actions once he exited the car, which is the point when petitioner allegedly pointed a gun at Sergeant Bocardo. Although Detective Roberts' position by the front passenger door would appear to have given him a good vantage point to see petitioner's hands, his report also indicates that his attention was immediately drawn to the rear passenger raising an AK-47 assault rifle at officers despite demands to put it down, the driver reaching in his waistband and yelling "get them b*tches," multiple gunshots being fired on the opposite side of the car, and his own need to fire his service weapon twice at the individual with the assault rifle.

The report states that it was "at this time" that petitioner exited the car, which Detective Roberts notes to be while gunfire was continuing, the rear passenger was still raising the assault rifle, and Detective Roberts was repositioning himself to get out of the line of fire from other officers. Significantly, Detective Roberts' report mentions nothing petitioner did after he exited the car, and the shootout occurring at the time provides a reasonable explanation for why his attention would not have been directed at petitioner after he exited the car.

¶ 57    Similarly, Detective Bush's report indicates that his attention was directed almost entirely on Thomas, the rear passenger who was continuing to point a rifle at officers despite their repeated yelling for him to put it down. Detective Bush noted that he fired 16 rounds into the vehicle while positioned behind it near the trunk. He then relocated to the rear passenger side to help pull Thomas out of the vehicle, mentioning that "he observed the front passenger exit the vehicle and on the ground prior to pulling the rear passenger out of the car." Given his vantage point, the shootout occurring at the time with Thomas, and the absence of any detail about petitioner in his report, it would be reasonable to expect him to explain that his attention was not focused on petitioner, whether he had a gun, or what he was doing beyond the fact that, by the time Thomas was pulled from the car, petitioner had exited the car also and was on the ground.

¶ 58    Neither officer's interview report indicates that petitioner immediately complied with officers' orders by laying on the ground without fleeing, that he did not have a gun, or that he did not point a gun at Sergeant Bocardo. Thus, it does not appear their testimony would be exculpatory or would contradict the testimony of Sergeant Bocardo that petitioner had a gun in his hands, attempted to flee when he exited the car, and pointed the gun at him two times. Further, by the time the defense was putting on its case, counsel had already elicited similar testimony from Sergeant Sanchez that he did not see petitioner with a gun and from Detective Graham that he did

not see him try to run as he exited the car, and was able to use this to argue his theory that Sergeant Bocardo had fabricated his testimony. For all these reasons, it was not objectively unreasonable for counsel not to have called Detectives Roberts or Bush as a witness in petitioner's defense.

¶ 59    Furthermore, petitioner has not satisfied the prejudice prong of *Strickland* by proving that, but for counsel's failure to call the three police officers as witnesses, there is a reasonable probably that the outcome of his trial would have been different. *Evans*, 186 Ill. 2d at 93. As stated, it does not appear that any of these officers would have testified that petitioner did not exit the car with a gun, did not point a gun at Sergeant Bocardo, or was compliant with police commands instead of attempting to flee, only that they did not see it. Petitioner was able to elicit testimony similar to this on cross-examination of Sergeant Sanchez, as well as testimony from Detective Graham that he did not see petitioner attempt to run as he exited the car, which supported his theory of defense. Also, Sergeant Bocardo's testimony was corroborated by the testimony Lieutenant Gorman, who testified that he heard Sergeant Bocardo yelling, with respect to petitioner, that "he has still got a gun, be careful." And Detective Egan testified that he recovered a 9-millimeter handgun from underneath petitioner's left side as he was on the ground.

¶ 60    For these reasons, the petition fails to make a substantial showing of ineffective assistance of trial counsel for failing to call Detective Roberts, Officer Troche, or Detective Bush as witnesses at trial. The trial court did not err in dismissing this claim.

¶ 61                    D. Prior incident involving Sergeant Bocardo

¶ 62    Third, petitioner argues that his trial counsel was ineffective for failing to investigate and impeach Sergeant Bocardo with evidence of a separate incident in which he shot and killed a vehicle occupant who was later discovered to have been unarmed. This occurred about 1 year and 8 months prior to the incident at issue in this case. It led to a civil lawsuit being filed against

Bocardo and other police officers, which went to trial about one month after petitioner's case went to trial. That lawsuit was ultimately the subject of this court's opinion in *Rivera v. Garcia*, 401 Ill. App. 3d 602 (2010). In summary, Sergeant Bocardo, who was then a detective, was asked by a fellow detective, Roberto Garcia, for help investigating the robbery of Garcia's teenage son by other teenagers. *Id.* at 605. While in an unmarked car, they became engaged in a chase with the teenagers, during which Detective Garcia and one of the teenagers exchanged gunfire. *Id.* at 605-06. The teenager who had been shooting eventually threw his gun out the car window, and their vehicle was eventually stopped. *Id.* at 606. Bocardo testified at the trial that as he approached the vehicle, he saw a black shiny object in the hand of one of the teenagers that he believed to be a gun, as a result of which he fired five times, killing the teenager. *Id.* It was later discovered that none of the teenagers were armed by the time police pulled their vehicle over, but police testified that the teenager who was killed had a tire iron on his lap. *Id.* In the civil trial, the jury issued a verdict in favor of Bocardo and found in a special interrogatory that he reasonably believed that deadly force was necessary to prevent death or great bodily harm to himself or another when he fired a weapon. *Id.* at 609.

¶ 63     One of the teenagers involved in the incident also became the subject of a proceeding for adjudication of wardship, which resulted in this court's opinion in *In re Julio C.*, 386 Ill. App. 3d 46 (2008). In that opinion, which was issued after the trial in petitioner's case, it was noted that the Office of Professional Standards (OPS) had begun an investigation into the car chase and shooting on the day it happened. *Id.* at 48. However, the outcome of that investigation is not disclosed in the reported cases or in the record in this case.

¶ 64     Petitioner contends that his trial counsel was ineffective for failing to conduct a reasonable investigation into the background of Sergeant Bocardo, the State's key witness against him, learn

of this prior incident, and present evidence that Sergeant Bocardo had a near-in-time history of shooting at an unarmed occupant of a vehicle he had pulled over. He suggests that this evidence would have been admissible, as evidence of prior police brutality or other misconduct has been admitted to prove a course of conduct on the part of the officers involved and to impeach their credibility. See *People v. Reyes*, 369 Ill. App. 3d 1, 18 (2006). He suggests it could also have been admissible on the basis that it showed Sergeant Bocardo had a motive to lie about the reason he shot petitioner to avoid it having any adverse impact on the civil lawsuit then pending against him.

¶ 65        As an initial matter, it is not evident to us exactly what information existed at the time of petitioner's trial that petitioner is contending his trial counsel should have used to impeach Sergeant Bocardo. At the time of his trial, Sergeant Bocardo's civil trial had not yet occurred. Thus, the testimony that is summarized in *Rivera* had not been given at that time. Neither of the two appellate court opinions summarizing the prior incident had been issued. The postconviction petition attaches no police reports or other documents pertaining to the prior incident involving Sergeant Bocardo to illustrate what information existed then that counsel could have used at petitioner's trial. Presumably some information of this sort could have been obtained from the court file of Sergeant Bocardo's civil trial or from the attorneys involved in that case by the time petitioner filed his postconviction petition, yet without it we are left to speculate about what information was available to trial counsel or what effect it would have had on the outcome of petitioner's trial.

¶ 66        Nevertheless, even if we assume for argument's sake that trial counsel could have obtained the information as summarized in *Rivera*, it does not appear that this evidence would have been admissible in petitioner's trial. In support of his argument of its admissibility, petitioner relies upon *Reyes*, a first-stage postconviction action in which two petitioners claimed that their confessions

to murder had been coerced by the tactics of a specific police detective. They sought postconviction relief based on new evidence of up to 23 additional instances involving individuals who claimed the same police detective had used similar tactics against them. *Id.* at 13-17. In its analysis of whether these additional instances constituted "new" evidence for purposes of relaxing *res judicata*, the court stated that while evidence of other bad acts would not be admissible to prove a propensity to commit those acts, it could be admissible for any other relevant purpose. *Id.* at 18. "For example, evidence of other acts of brutality could be used to prove a course of conduct on the part of the officers involved and could be used to impeach these officers' credibility." *Id.* "Prior allegations of brutality have been found admissible where they involved the same officer or officers as in the defendant's case, where they involved similar methods of abuse, and where they occurred at or near the time of the defendant's allegations." *Id.* at 19 (citing *People v. Patterson*, 192 Ill. 2d 93, 115 (2000)).

¶ 67    We find petitioner's reliance on *Reyes* to be misplaced. *Reyes* did not involve a single incident, but rather it involved evidence of similar coercive tactics by the same detective against multiple suspects and witnesses, warranting the conclusion that the detective had engaged in a pattern or course of conduct which he also used against petitioners. Here, petitioner has not shown that the single incident involving Sergeant Bocardo shooting a teenager whom he believed to be armed but was not amounts to a pattern or course of conduct of shooting at unarmed vehicle occupants and justifying the shooting by later claiming he thought they were armed. Rather, petitioner appears to be arguing that his trial counsel could have used this evidence to show that Sergeant Bocardo had a propensity to shoot unarmed individuals and then falsely claim they were armed to avoid punishment, and the evidence was plainly inadmissible for that purpose. See *Reyes*, 369 Ill. App. 3d at 18.

¶ 68    Also, it is clear that the fact that a civil lawsuit was pending against Sergeant Bocardo unrelated to petitioner or the case at issue would not have been admissible for the purpose of impeaching him by showing that his testimony was influenced by interest, bias, or a motive to testify falsely. *People v. Nelson*, 235 Ill. 2d 386, 422 (2009); *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 66; *People v. Davis*, 193 Ill. App. 3d 1001, 1005 (1990); *People v. Cameron*, 189 Ill. App. 3d 998, 1002 (1989). Any argument that his testimony in petitioner's case was influenced by the pending civil lawsuit against him would have been considered too remote and uncertain to justify admission of evidence of that civil suit. See *Cameron*, 189 Ill. App. 3d at 1003.

¶ 69    Petitioner relies upon *People v. Phillips*, 95 Ill. App. 3d 1013 (1981), but we find that case distinguishable. There, a defendant on trial for attempted murder and other charges claimed in defense that he was defending his brother from a police officer who had allegedly pulled his gun and was threatening the defendant's brother. *Id.* at 1018. This court held that the trial court had erred in preventing the defendant from cross-examining the officer with evidence that he had been suspended 15 times from the police department, including 2 instances in which he had improperly displayed his weapon and then filed a false report. *Id.* at 1019. This court agreed with the defendant's argument that the officer's history of suspensions, including for similar conduct,  may have given him a motive to testify falsely based on his desire to avoid further disciplinary action or to lose medical coverage or compensation if it were found that he had abused his power by improperly displaying his weapon. *Id.* at 1021.

¶ 70    Here, there is no evidence or allegation in the postconviction petition that Sergeant Bocardo faced any disciplinary action because of the prior incident that might have influenced his testimony in petitioner's case. The petition alleges only that if counsel had investigated Sergeant Bocardo's background, counsel would have learned that he was investigated for this incident by OPS. Courts

have treated evidence of police discipline differently than mere evidence of pending civil charges on the question of whether prior misconduct may be used to impeach by showing bias, interest, or motive to testify falsely. See *e.g.*, *Nelson*, 235 Ill. 2d at 422; *People v. Mason*, 28 Ill. 2d 396, 402-03 (1963); *Cacinci*, 2015 IL App (1st) 130135, ¶ 66; *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 20; *People v. Robinson*, 56 Ill. App. 3d 832, 840 (1977). Absent any evidence that Sergeant Bocardo faced discipline for it, we reject petitioner's argument that his trial counsel could have introduced evidence of the prior incident and argued that he had a motive in petitioner's case to state that petitioner was armed to avoid discipline for having shot him.

¶ 71      We also find petitioner's reliance on *People v. Averhart*, 311 Ill. App. 3d 492 (1999), to be misplaced. There, the court held that a defendant convicted of possession of a controlled substance should have been allowed to cross-examine the arresting officer with evidence that the same defendant had previously made a compliant alleging abuse and false arrest against the same officer, arising out of a previous incident in which that officer arrested the same defendant. The court held that the fact that the same defendant had previously made a compliant against the same officer was relevant to show bias or motive in the officer's testimony. *Id.* at 499. Also, part of the theory of the defense was that the officer had planted drugs on the defendant to effect an arrest, and the court found that because of this, the evidence showing motive to testify falsely was not collateral and that the defendant should have been allowed to develop this theory. *Id.* at 501.

¶ 72      The facts of *Averhart* are far different from the facts of this case. Here, the prior incident that petitioner argues should have been used to impeach Sergeant Bocardo did not involve petitioner. Petitioner had not made a compliant against Sergeant Bocardo or done anything that would have shown that Sergeant Bocardo was biased against him or had a motive to give fabricated testimony.

¶ 73      In conclusion, evidence of the prior incident involving Sergeant Bocardo would not have

been admissible to show a pattern or course of conduct, or to impeach him by a showing of bias, motive, or interest. Accordingly, petitioner has failed to show a reasonable probably that the outcome of his trial would have been different but for his trial counsel's alleged failure to learn about this incident and seek to use evidence of it at petitioner's trial. *Evans*, 186 Ill. 2d at 93. Petitioner's postconviction petition fails to make a substantial showing of ineffective assistance of trial counsel for failing to investigate and make use of this evidence, and there was no error in the trial court's dismissal of this claim.

¶ 74                    E. Destruction of Grand Prix

¶ 75        Finally, petitioner argues that his trial counsel was ineffective for failing to seek relief based on the State's destruction of the Grand Prix after trial counsel had requested to examine it but before he had the opportunity to do so. According to the petition, on an unknown date no later than January 12, 2007, petitioner's trial counsel made a request to Assistant State's Attorney Thomas Mahoney to be able to inspect the Grand Prix. That day, Mahoney contacted Detective Gregory Jacobson of the Chicago Police Department about that request. In a report attached to the petition dated February 8, 2007, Detective Jacobson documented that police had taken possession of the Grand Prix after the incident at issue, and it had been stored at a City of Chicago impound facility. Although the timing of Detective Jacobson's phone calls is unclear from his report, it indicates that he first contacted an agent of ARI Fleet Leasing about the vehicle and was told that, on November 21, 2006, it had been removed from the impound facility and relocated to Co-Part Auction in Chicago Heights. He then contacted a representative of Co-Part Auction and was told that on January 12, 2007, the car had been sold to Discount Auto in Sturgeon Bay, Wisconsin. He then contacted the owner of Discount Auto, who "related that the vehicle was in his possession as of 30 January 2006, and it was in the process of being salvaged." The report states that this

information was forwarded to Assistant State's Attorney Ursula Walowski. A bill of sale from Co-Part Auction that is also attached to the petition indicates that the Grand Prix was sold by Zurich American Insurance Company to Discount Auto on January 12, 2007, and that payment was made on January 16, 2007.

¶ 76      Petitioner argues that his trial counsel was ineffective for failing to argue that the State's destruction of the Grand Prix after counsel had requested to inspect it constituted a violation of his due process rights and warranted dismissal of the charges against him. See *People v. Walker*, 257 Ill. App. 3d 332, 336 (1993) (dismissing charges where knife and clothing that were central to defense of misidentification were destroyed six weeks after offense). He argues that even if dismissal was not warranted, his counsel could have sought to have the jury instructed that it could infer that the lost evidence was against the State's interest. See *People v. Danielly*, 274 Ill. App. 3d 358, 368 (1995)). He argues that this jury instruction would be appropriate independent of due process principles as a discovery sanction for destroying the Grand Prix after his counsel's request to inspect it. See *id.* (finding that state's destroying of evidence did not violate due process but, as case was remanded for new trial on other grounds, holding an adverse inference instruction should be given); see also *People v. Camp*, 352 Ill. App. 3d 257, 262 (2004) (where dismissal of charges was disproportionate to State's loss of evidence, giving adverse inference instruction was more appropriate discovery sanction).

¶ 77      When a court reviews a claim that lost or destroyed evidence has resulted in a due process violation, its analysis depends on whether the evidence at issue is materially exculpatory or only potentially useful to the defense. *People v. Sutherland*, 223 Ill. 2d 187, 235-36 (2006). In cases of the latter category, a criminal defendant must show bad faith on the part of the police for failing to preserve potentially useful evidence to constitute a denial of due process. *Id.* at 235-37 (citing

*Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Courts seek to achieve a balance between promoting the preservation of evidence through the possibility of sanctions and not rewarding a defendant for its inadvertent loss by considering: " '(1) the degree of negligence or bad faith by the State in losing the evidence, and (2) the importance of the lost evidence relative to the evidence presented against the defendant at trial.' " *Id.* at 237 (quoting *People v. Hobley*, 159 Ill. 2d 272, 307 (1994).

¶ 78     In his briefs to this court, petitioner notably fails to articulate any explanation of the importance of the Grand Prix as evidence on the charge of attempted murder against him. According to the evidence at trial, petitioner was outside of the car and attempting to flee by the time Sergeant Bocardo saw petitioner holding a handgun and pointing it twice at him. Petitioner was outside the car when he was apprehended. The handgun was recovered from underneath him when he was on the ground outside the car. No witness testified that petitioner had a gun or fired shots while he was inside the car. The car itself was not critical or central to the State's case against him for attempted murder. We fail to conceive how an inspection of the car could have shown that petitioner had immediately complied with the police's demands or that he did not actually attempt to flee. Absent any argument or explanation on this point by petitioner, we cannot see what potentially useful evidence against the attempted murder charge could truly have resulted from an inspection of the Grand Prix. Thus, even if counsel had requested dismissal of the charges based on a due process violation, such relief would almost certainly have been deemed too excessive when balanced against the relative unimportance of the car itself as evidence in the trial against petitioner. See *Sutherland*, 223 Ill. 2d at 237. For this reason, the prejudice prong of the *Strickland* test cannot be satisfied here. There is no reasonable probability that the result of petitioner's trial would have been different if his counsel had moved for dismissal of the attempted murder charge

based on a due process violation. *Evans*, 186 Ill. 2d at 93.

¶ 79     The same absence of prejudice exists with respect to counsel's failure to obtain an adverse inference instruction. In *Danielly*, upon which petitioner relies, this court stated that an appropriate instruction under the facts of that case would be the one discussed by the United States Supreme Court in *Youngblood*, which stated: " 'If you find that the State has allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest.' " *Danielly*, 274 Ill. App. 3d at 368 (quoting *Youngblood*, 488 U.S. at 59-60 (Stevens, J., concurring)). Here, even if petitioner's trial counsel had obtained an instruction similar to this, petitioner nevertheless fails to argue or explain what fact the jury could reasonably have inferred in his favor from the destruction of the Grand Prix that would affect his conviction on the charge of attempted murder. As stated, petitioner was outside the car at the time of the alleged conduct giving rise to the attempted murder conviction. Any argument that petitioner was prejudiced by his trial counsel's failure to request his indictment be dismissed or an adverse inference instruction based on the destruction of the Grand Prix would appear to be speculative, which is insufficient to establish the prejudice that *Strickland* requires. *Bew*, 228 Ill. 2d at 135.

¶ 80     We therefore hold that the postconviction petition fails to make a substantial showing of ineffective assistance of counsel based on the failure to seek relief because of the destruction of the Grand Prix, and the trial court did not err in dismissing this claim.

¶ 81                                  III. CONCLUSION

¶ 82     For the foregoing reasons, the trial court's dismissal of petitioner's second amended petition for postconviction relief is affirmed.

¶ 83     Affirmed.